## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ALLAN KATES, Derivatively on Behalf of METLIFE, INC., | Case No.: 19-cv-1266-LPS-JLH |
| Plaintiff, | **VERIFIED SHAREHOLDER SECOND AMENDED DERIVATIVE COMPLAINT** |
| vs. | |
| STEVEN A. KANDARIAN, CHERYL W. GRISÉ, CARLOS M. GUTIERREZ, GERALD L. HASSELL, DAVID L. HERZOG, R. GLENN HUBBARD, EDWARD J. KELLY, III, WILLIAM E. KENNARD, JAMES M. KILTS, CATHERINE R. KINNEY, DIANA McKENZIE, and DENISE M. MORRISON | **JURY DEMANDED** |
| Defendants, | |
| -and- | |
| METLIFE, INC., | |
| Nominal Defendant. | |

Plaintiff Allan Kates ("Plaintiff") by and through his undersigned counsel, derivatively on behalf of Nominal Defendant MetLife, Inc. ("MetLife" or the "Company"), submits this Verified Shareholder Second Amended Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, as to matters including (i) documents publicly filed in *City of Westland Police and Fire Retirement System v. MetLife, Inc., et al.*, No. 1:12-cv-00256-LAK-AJP (S.D.N.Y.) (the "2012 Litigation"); (ii) the allegations contained in pleadings filed in *In the Matter of MetLife, Inc.*, Docket No. E-2017-0119 (Mass. Securities Div., June 25, 2018) (the "Massachusetts Litigation") and the consent order entered in the Massachusetts

Litigation dated December 18, 2018 (the "MA Consent Order"); (iii) the consent order in the New York Department of Financial Services ("NYDFS") investigation (the "NYDFS Investigation"), dated January 28, 2019 (the "NYDFS Consent Order") and the press release issued by the NYDFS that same day related thereto (the "NYDFS Press Release"); (iv) documents and information relating to the regulatory settlement agreement entered into by MetLife and several state insurance regulators on April 19, 2012 (the "2012 Settlement Agreement") in connection with the multi-state regulators' investigation (the "Multi-State Investigation") and a review of publicly available information, including filings by MetLife with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference call transcripts, MetLife's website and other publicly available filings in lawsuits, and matters of public record.  Plaintiff believes, based on the review and analysis of the above cited information, the allegations set forth below state a claim for which relief shall be granted.

## <u>NATURE OF THE ACTION</u>

1.      Plaintiff, a stockholder of MetLife, brings this derivative action on behalf and for the benefit of MetLife, against MetLife's board of directors (each a "Director," collectively the "Board") and certain of its senior officers for their violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder ("Rule 10b-5"), and breaches of fiduciary duties and other wrongful conduct as alleged herein during the period of February 27, 2013 to the present (the "Relevant Period").  Defendants' actions have caused, and will continue to cause, substantial harm, financial and otherwise, and other damages to MetLife, including damages to its corporate reputation and goodwill.

2.      MetLife is one of the world's leading financial services companies, providing its customers with insurance, annuities, employee benefits and asset management products and

4840-6156-1262, v. 1

services.  As described in MetLife's Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K"), MetLife organizes its United States business into three main segments: (i) Retirement and Income Solutions ("RIS"), (ii) Group Benefits and (iii) Property and Casualty. The Company's RIS business practices are the subject of Plaintiff's claims in this litigation.  Earlier in MetLife's business history, the RIS business segment was organized and named as MetLife's Corporate Benefit Funding ("CBF") segment.

3.      One of RIS's major products is pension risk transfers.  As more fully described below, MetLife failed to establish an effective internal control and maintain adequate reserves for its pension risk transfer products within the United States.  MetLife's failure is a result of the Company's intentional and deliberate employment of a defective and inadequate practice long *known* to the Board.  Yet the Board took no action to remedy the Company's defective internal control, leading to investigations by multiple states and federal regulatory agencies, and fines and restitutions in hundreds of millions of dollars—all paid by MetLife.

4.      On December 15, 2017, MetLife filed a Form 8-K, admitting publicly for the first time that the Company had issues in relation to verifying and locating annuitants of its group annuity products and that the issues had adversely affected MetLife's reserves.  Shortly thereafter, MetLife, in its January 29, 2018 press release, acknowledged that (i) the Company identified material weakness in its internal control over financial reporting; (ii) the deficient internal control caused the Company to prematurely release reserves for group annuities; and (iii) that MetLife expected to increase its reserves by more than $500 million, thus implying that MetLife's expected earnings will be reduced by more than $500 million.

5.      The effect of the January 29, 2018 press release was immediate, and drastic.  On that news alone, MetLife's share price plummeted from $54.40 on January 29 to $49.73 the

following day, falling further to $48.07 on January 31, a decline of more than 11.5% within just two days.

6.      MetLife's public admission of its faulty business practice and internal control was contrary to its prior public statements, suggesting that MetLife had made materially false and misleading statements or omissions concerning the Company's pension risk transfer practice, remediation efforts under the 2012 Settlement Agreement and compliance with SEC rules and regulations.

7.      Defendant Steven A. Kandarian ("Kandarian"), MetLife's Chief Executive Officer ("CEO") during the Relevant Period, stated that the individuals who were responsible for allowing the improper business practice to proliferate within the Company would be held "accountable." Shortly after the January 29, 2018 press release was issued, the Company announced that non-party John Hele ("Hele"), MetLife's Chief Financial Officer ("CFO"), and non-party Robin F. Lenna ("Lenna"), head of RIS, had "retired."

8.      On January 8, 2019, the Company announced that Kandarian was retiring as CEO and Chairman of the Board effective April 30, 2019.  Unsurprisingly, media outlets linked Kandarian's departure to MetLife's embarrassingly revealed, wide-spread systematic failure in the Company's internal control and business practice concerning pension risk transfer.

9.      However, the Company was in a more serious predicament than departures of its certain senior officers could resolve.  Soon after its public filing and press release in early 2018, the Company faced the Massachusetts Litigation, and investigations and inquiry by regulators, including the SEC and the NYDFS, with the latter resulting in the NYDFS Investigation.

10.      The Massachusetts Litigation ended with MetLife entering into the MA Consent Order, as announced on December 19, 2018.  Pursuant to the MA Consent Order, MetLife is

4

required to: (i) pay a $1 million administrative fine; (ii) receive a public censure from the Massachusetts Securities Division; and (iii) implement reformatory measures to improve and enhance MetLife's practice for locating pension risk transfer annuitants—changes that closely resemble those the Company had previously agreed to in the 2012 Settlement Agreement, *i.e.*, before the Relevant Period, for locating other annuitants.

11.     On January 28, 2019, the NYDFS Consent Order and NYDFS Press Release were issued, in which the NYDFS announced that the NYDFS Investigation had concluded with MetLife agreeing to pay $19.75 million in fines for violating numerous New York insurance laws and regulations.  MetLife also agreed to pay $189 million in restitution to pension risk transfer annuitants located in New York and elsewhere, $66 million of which remains outstanding.  The NYDFS Consent Order also imposed numerous remedial measures, including having MetLife: (i) establish full statutory reserves sufficient to cover all pension risk transfer annuitants; (ii) send letters every 5 years to pension risk transfer annuitants until all benefits are paid to them; (iii) hire a third-party service provider that specializes in locating missing pension risk transfer annuitants; and (iv) utilize an enhanced death database, including data from the Social Security Administration's Death Master File ("SSA-DMF") and from additional sources.

12.     The revelations in the December 15, 2017 Form 8-K and the January 29, 2018 press release caused MetLife's stock to drop precipitously on both occasions, collectively erasing over $5 billion in market capitalization.

## JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Sections 10(b) and 20(a) of the

Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

14.     This Court has jurisdiction over each named Defendant because each Defendant is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this District Court permissible under traditional notions of fair play and substantial justice.

15.     This Court has jurisdiction over the Nominal Defendant MetLife because MetLife is a Delaware corporation that conducts business and maintains operations in this District.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and because MetLife's Charter includes an exclusive forum provision whereby this action is required to be filed in a state or federal court located within the State of Delaware.

## PARTIES

### Plaintiff

17.     *Plaintiff Allan Kates* ("Plaintiff") acquired MetLife securities long before the start of the Relevant Period and will continue to hold MetLife shares throughout the pendency of this action.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company

### Nominal Defendant

18.     *Nominal Defendant MetLife* provides life insurance, annuities, employee benefits, and asset management products in the United States and internationally. The Company is a Delaware corporation with its principal executive offices located at 200 Park Avenue, New York, New York 10166.  MetLife's securities trade on the New York Stock Exchange ("NYSE") under the symbol "MET."

6

**Defendants**

19.     ***Defendant Steven A. Kandarian*** ("Kandarian") was the Company's President and Chief Executive Officer ("CEO") since May 1, 2011.  Kandarian had been the Chairman of the Board since January 1, 2012.   Kandarian had been the Chairman of MetLife's Executive Committee continuously since at least 2012.  Kandarian held various other executive positions with MetLife since joining the Company in April 2005.  Between 2012 and 2017, MetLife paid Kandarian the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2017 | $1,550,000.00 | $7,103,183.00 | $2,078,380.00 | $3,000,000.00 | $670,763.00 | $324,395.00 | $14,726,721.00 |
| 2016 | $1,525,000.00 | $6,874,761.00 | $1,897,550.00 | $4,000,000.00 | $705,651.00 | $278,977.00 | $15,281,939.00 |
| 2015 | $1,425,000.00 | $6,837,430.00 | $1,939,582.00 | $4,500,000.00 | $724,960.00 | $273,909.00 | $15,700,881.00 |
| 2014 | $1,325,000.00 | $6,027,795.00 | $1,806,120.00 | $5,000,000.00 | $709,963.00 | $294,924.00 | $15,163,802.00 |
| 2013 | $1,212,500.00 | $5,854,539.00 | $1,729,089.00 | $5,000,000.00 | $578,929.00 | $239,281.00 | $14,614,338.00 |
| 2012 | $1,066,667.00 | $3,897,031.00 | $3,760,313.00 | $4,200,000.00 | $431,984.00 | $313,016.00 | $13,669,011.00 |
| | | | | | | | $99,787,304.00 |

20.     Immediately before being named as the Company's CEO, Kandarian worked at MetLife as Executive Vice President and Chief Investment Officer beginning in April 2005.

21.     Following the events detailed herein, on January 8, 2019, MetLife announced that Defendant Kandarian had resigned as CEO and Chairman of the Board effective as of April 30, 2019.  Defendant Kandarian was replaced as CEO by Michel Khalaf ("Khalaf") and as Chairman by R. Glenn Hubbard ("Hubbard"), who became the Board's non-executive Chairman.

22.     Kandarian was knowledgeable about the importance of timely and uninterrupted payments of benefits by pension plans.  Before working for MetLife, he served as the executive director of the Pension Benefit Guaranty Corporation ("PBGC") from 2001 to 2004. The PBGC is a federally chartered corporation created by the Employee Retirement Income Security Act of 1974 ("ERISA") designed to protect the retirement incomes of approximately 37 million American

workers, retirees and their families in private sector defined benefit pension plans.  The executive

director of the PBGC reports to, among others, the Chairman of the Department of Labor ("DOL").

As the PBGC's executive director, Defendant Kandarian led the PBGC in fulfilling its core

strategic goal—paying pension benefits on time and accurately.

23.     Kandarian signed each of the Company's Forms 10-K and Forms 10-Q filed during

the Relevant Period and certified them pursuant to SOX.  Defendant Kandarian is a defendant in

the 2012 Litigation.

24.     **Defendant Cheryl W. Grisé** ("Grisé") has served as a member of the MetLife Board

since 2004.  Grisé is and has been the Chairman of MetLife's Governance and Corporate

Governance Committee continuously since at least 2012.  Grisé has also been a member of

MetLife's Audit Committee, Compensation Committee, and Executive Committee continuously

since at least 2012.  Grisé has also served as Lead Director continuously from at least 2011 through

June 13, 2017.  Between 2012 and 2017, MetLife paid Grisé the following compensation:

| Year of Compensation | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $87,500.00 | $75,071.00 | $1,620.00 | $164,191.00 |
| 2016 | $219,519.00 | $15,023.00 | $1,635.00 | $371,177.00 |
| 2015 | $180,000.00 | $130,023.00 | $1,619.00 | $311,642.00 |
| 2014 | $180,000.00 | $130,010.00 | $1,619.00 | $311,629.00 |
| 2013 | $180,000.00 | $130,014.00 | $1,619.00 | $311,633.00 |
| 2012 | $185,469.00 | $139,882.00 | $6,622.00 | $331,973.00 |
| | | | | $1,802,245.00 |

25.     **Defendant Carlos M. Gutierrez** ("Gutierrez") has served as a member of the

MetLife Board since 2013.  Gutierrez is and has been a member of MetLife's Governance and

Corporate Responsibility Committee continuously since at least 2012, and has been a member of

MetLife's Investment Committee since at least 2014.  Between 2013 and 2017, MetLife paid

Gutierrez the following compensation:

| Year of Compensation | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $75,000.00 | $75,071.00 | $1,620.00 | $151,691.00 |
| 2016 | $150,000.00 | $150,023.00 | $1,635.00 | $301,658.00 |
| 2015 | $130,000.00 | $130,023.00 | $1,619.00 | $261,642.00 |
| 2014 | $130,000.00 | $130,010.00 | $1,619.00 | $261,629.00 |
| 2013 | $146,429.00 | $146,446.00 | $1,355.00 | $294,230.00 |
| | | | | $1,270,850.00 |

26.     **Defendant Gerald L. Hassell** ("Hassell") has served as a member of the MetLife Board since 2018.  Hassell is a member of MetLife's Audit Committee, Compensation Committee, and Finance and Risk Committee.

27.     **Defendant David L. Herzog** ("Herzog") has served as a member of the MetLife Board since 2016.  Herzog has been the Chairman of MetLife's Audit Committee continuously since 2017.  Herzog has been a member of MetLife's Compensation Committee, and Executive Committee, and Finance and Risk Committee continuously since 2017.  Between 2016 and 2017, MetLife paid Herzog the following compensation:

| Year of Compensation | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $95,000.00 | $75,071.00 | $1,620.00 | $171,691.00 |
| 2016 | $96,841.00 | $96,841.00 | $447.00 | $194,129.00 |
| | | | | $365,820.00 |

28.     Herzog was appointed to the Board in 2016 after that year's Annual Meeting.  As a result, the Company paid Mr. Herzog a prorated annual retainer fee in advance for services from his appointment through the 2017 Annual Meeting.

29.     **Defendant R. Glenn Hubbard** ("Hubbard") has served as a member of the MetLife Board since 2007.  Hubbard has been the Chairman of MetLife's Investment Committee

continuously since at least 2012.  Hubbard has been a member of MetLife's Executive Committee and Finance and Risk Committee continuously since at least 2012.  Between 2012 and 2017, MetLife paid Hubbard the following compensation:

| Year of Compensation | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $100,000.00 | $75,071.00 | $6,620.00 | $181,691.00 |
| 2016 | $175,000.00 | $150,023.00 | $6,635.00 | $331,658.00 |
| 2015 | $155,000.00 | $130,023.00 | $6,619.00 | $291,642.00 |
| 2014 | $155,000.00 | $130,010.00 | $6,619.00 | $291,629.00 |
| 2013 | $155,000.00 | $130,014.00 | $6,619.00 | $291,633.00 |
| 2012 | $160,469.00 | $139,882.00 | $6,622.00 | $306,973.00 |
| | | | | $1,695,226.00 |

30. ***Defendant Edward J. Kelly, III*** ("Kelly") has served as a member of the MetLife Board since 2015.  Kelly has been a member of MetLife's Audit Committee and Finance and Risk Committee continuously since 2015, and has been a member of MetLife's Compensation Committee and Executive Committee since 2017.  In 2018, Kelly served as Chairman of the Finance and Risk Committee.  Between 2015 and 2017, MetLife paid Kelly the following compensation:

| Year of Compensation | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $92,500.00 | $75,071.00 | $1,620.00 | $169,691.00 |
| 2016 | $168,269.00 | $150,023.00 | $1,635.00 | $319,927.00 |
| 2015 | $152,075.00 | $152,121.00 | $1,487.00 | $305,683.00 |
| | | | | $795,301.00 |

4840-6156-1262, v. 1

31.     Kelly was appointed to the Board in 2015 before that year's Annual Meeting.  As a result, the Company paid Kelly a prorated annual retainer fee in advance for services from his appointment through the 2015 Annual Meeting.

32.     **Defendant William E. Kennard** ("Kennard") has served as a member of the MetLife Board since 2013.  Kennard has been a member of MetLife's Investment Committee continuously since at least 2014, serving as its Chairman in 2017 and 2018.  Kennard has been a member of MetLife's Finance and Risk Committee continuously since 2015 and Executive Committee since 2017.  Kennard was also a member of MetLife's Governance and Corporate Responsibility Committee in 2014.  Between 2013 and 2017, MetLife paid Kennard the following compensation:

| Year of Compensation | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $87,500.00 | $75,071.00 | $1,620.00 | $164,691.00 |
| 2016 | $170,000.00 | $150,023.00 | $6,635.00 | $326,658.00 |
| 2015 | $130,000.00 | $130,023.00 | $6,619.00 | $266,642.00 |
| 2014 | $130,000.00 | $130,010.00 | $6,619.00 | $266,629.00 |
| 2013 | $77,500.00 | $77,514.00 | $563.00 | $155,577.00 |
| | | | | $1,180,197.00 |

33.     The Board also approved a cash payment of $20,000 in 2016 to Kennard for services on a Special Committee of the Board.

34.     **Defendant James M. Kilts** ("Kilts") has served as a member of the MetLife Board since 2005.  Kilts has been the Chairman of MetLife's Compensation Committee continuously since at least 2011.  He has been a member of MetLife's Compensation Investment Committee continuously since at least 2011, the Executive Committee since 2014, and the Governance and Corporate Responsibility Committee.  Between 2012 and 2017, MetLife paid Kilts the following compensation:

11

| Year of Compensation | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $90,000.00 | $75,071.00 | $6,620.00 | $171,691.00 |
| 2016 | $180,000.00 | $150,023.00 | $6,635.00 | $336,658.00 |
| 2015 | $155,000.00 | $130,023.00 | $6,619.00 | $291,642.00 |
| 2014 | $155,000.00 | $130,010.00 | $6,619.00 | $291,629.00 |
| 2013 | $155,000.00 | $130,014.00 | $6,619.00 | $291,633.00 |
| 2012 | $160,469.00 | $139,882.00 | $6,622.00 | $306,973.00 |
| | | | | $1,690,226.00 |

35. **_Defendant Catherine R. Kinney_** ("Kinney") has served as a member of the MetLife Board since 2009. Kinney has been a member of MetLife's Audit Committee and Finance and Risk Committee continuously since at least 2012. Between 2012 and 2017, MetLife paid Kinney the following compensation:

| Year of Compensation | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $75,000.00 | $75,071.00 | $1,620.00 | $151,691.00 |
| 2016 | $150,000.00 | $150,023.00 | $6,635.00 | $306,658.00 |
| 2015 | $130,000.00 | $130,023.00 | $4,119.00 | $264,142.00 |
| 2014 | $130,000.00 | $130,010.00 | $4,119.00 | $264,129.00 |
| 2013 | $130,000.00 | $130,014.00 | $4,119.00 | $264,133.00 |
| 2012 | $155,469.00 | $139,882.00 | $4,122.00 | $299,473.00 |
| | | | | $1,550,226.00 |

36. **_Defendant Diana McKenzie_** ("McKenzie") has served as a member of the MetLife Board since 2018. Per MetLife's website, McKenzie is a member of MetLife's Audit Committee.

37. **_Defendant Denise M. Morrison_** ("Morrison") has served as a member of the MetLife Board since 2014. Morrison has been a member of MetLife's Compensation Committee and Governance and Corporate Responsibility Committee continuously since 2014. Between 2014 and 2017, MetLife paid Morrison the following compensation:

4840-6156-1262, v. 1

| Year of Compensation | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $75,000.00 | $75,071.00 | $1,620.00 | $151,691.00 |
| 2016 | $170,000.00 | $150,023.00 | $1,635.00 | $321,658.00 |
| 2015 | $130,000.00 | $130,023.00 | $1,619.00 | $261,642.00 |
| 2014 | $151,429.00 | $151,481.00 | $1,487.00 | $304,397.00 |
| | | | | $1,039,388.00 |

38.     The Board also approved a cash payment of $20,000 in 2016 to Morrison for services on a Special Committee of the Board.

39.     Defendants Kandarian, Grisé, Gutierrez, Hassell, Herzog, Hubbard, Kelly, Kennard, Kilts, Kinney, McKenzie and Morrison, are herein referred to as "Director Defendants."

**METLIFE CORPORATE GOVERNANCE**

40.     As members of MetLife's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

41.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of MetLife, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

42.     As discussed in MetLife's Form DEF 14A filed with the SEC on April 26, 2018 (the "2018 Proxy"), the Company maintains the following six standing Board Committees.  In the 2018 Proxy, MetLife describes the functions and responsibilities of each committee in relevant part:

- **Audit Committee** – oversees the Company's accounting and financial reporting processes and the audits of its financial statements, the adequacy of

the Company's internal control over financial reporting, the integrity of its financial statements, and the Company's compliance with legal and regulatory requirements.

- **Compensation Committee** – approves the goals and objectives relevant to the Chief Executive Officer's Total Compensation, evaluates the Chief Executive Officer's performance in light of such goals and objectives, and recommends, for approval by the Independent Directors, the Chief Executive Officer's Total Compensation level based on such evaluation; oversees management's efforts to mitigate risks associated with the development and administration of the Company's compensation programs, including efforts to ensure that the Company's incentive plans do not encourage or reward excessive risk taking; and reviews and discusses with management the Compensation Discussion and Analysis to be included in the proxy statement.

- **Executive Committee** – ". . . may exercise the powers and authority of the Board of Directors during intervals between meetings of the Board of Directors. The Executive Committee did not meet in 2017."

- **Finance and Risk Committee** – oversees the Company's financial policies and strategies; its capital structure, plans and policies, including capital adequacy, dividend policies and share issuances and repurchases; its proposals on certain capital actions, strategic actions and other financial matters; and its assessment and management of material risks.

- **Governance and Corporate Responsibility Committee** – oversees the Company's compliance responsibilities and activities, including its legislative

14

and regulatory initiatives, sales practices, and ethics and compliance programs, as well as the Company's policies concerning its corporate responsibility programs, oversees the Board evaluation and is responsible for reviewing the compensation and benefits of the Company's non-employee Directors, and also oversees the management and mitigation of risks related to failure to comply with required or appropriate corporate governance standards.

- **Investment Committee** – oversees the management of investment activities of MetLife and, on a consolidated basis, of MetLife and all of its direct and indirect subsidiaries.  The Investment Committee, in coordination with the Finance and Risk Committee, also oversees the management and mitigation of risks associated with the investment portfolios of MetLife and of the consolidated MetLife enterprise.

43.    The 2018 Proxy states "THE BOARD HAS MANY OTHER STRUCTURAL SAFEGUARDS AND GOVERNANCE PRACTICES THAT PROVIDE EFFECTIVE INDEPENDENT OVERSIGHT OF THE COMPANY." (emphasis in original).  The 2018 Proxy also claims that "[e]ach Board committee operates under a written charter that sets forth responsibilities relating to key matters."  However, a search of MetLife's website for these charters or information about these six Board committees does not support this representation.  In fact, MetLife's website attaches only copies of charters for the Audit Committee, Compensation Committee, and Governance and Corporate Responsibility Committee.  Contrary to MetLife's representations in its 2018 Proxy, there are no MetLife committee charters for the Executive Committee, Finance and Risk Committee, or the Investment Committee.  Surprisingly, MetLife's website does not even mention the Executive Committee, Finance and Risk Committee, or

Investment Committee.  And the provided chart of Board Committee Membership (on its website) omits these three committees and the membership of each.[1]

## Codes of Conduct

44.     MetLife has adopted and maintains three separate Codes of Conduct: (i) Directors' Code of Business Conduct and Ethics; (ii) Code of Conduct (for employees); and (iii) Financial Management Code of Professional Conduct.  In its 2018 Proxy, MetLife states that the Directors' Code of Business Conduct and Ethics applies to all members of the Company's Board of Directors including the CEO.  It also states that its Code of Conduct applies to all employees of the Company and its affiliates, including the Executive Officers of the Company.  Finally, MetLife states that its Financial Management Code of Professional Conduct applies to the Company's CEO, Chief Financial Officer (the "CFO"), Chief Accounting Officer and all professionals in finance and finance-related departments.

## Directors' Code of Business Conduct and Ethics

45.     As it appears on its website, MetLife's Directors' Code of Business Conduct and Ethics ("Directors' Code of Conduct") states that it was adopted on January 21, 2004.  There is no indication this Code has been revised, amended, or updated since that date.

46.     The Directors' Code of Conduct provides in relevant part:

> MetLife Directors have a responsibility to lead by example, acting with truth, sincerity and fairness in all decisions.

*     *     *

> Each Director is expected to comply with the letter and spirit of this Code.

---

[1]     *See* Exhibit 1 - MetLife Board Committees-Audit, Comp, Governance November 2018, which is also viewable at https://www.metlife.com/content/dam/metlifecom/us/homepage/about-us/corporate-governance/MetLifeBoardCommittees-AuditCompGovernance_November2018.pdf.

16

\*     \*     \*

**Compliance with Laws, Rules and Regulations**

Directors shall comply with laws, rules and regulations applicable to them as Directors of MetLife.

**Fair Dealing**

MetLife's reputation for ethical behavior is critical to its success. Directors must observe the highest ethical standards and act with integrity and honesty to promote an environment that encourages MetLife's officers and employees to sustain and enhance MetLife's reputation and treat each other as well as customers, suppliers, and competitors with fairness and respect. Directors shall not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice.

\*     \*     \*

**Compliance Procedures**

Directors shall communicate any suspected violations of this Code, including any violation of law or governmental rule or regulation, promptly to the General Counsel.  Alleged violations shall be investigated by the Board or by a person or persons designated by the Board and appropriate action shall be taken in the event of any violations of the Code.

47.     The Directors' Code of Conduct requires annual certification by each Director.

**Code of Conduct**

48.     MetLife's Code of Conduct ("Code of Conduct") does not state when it was adopted and there is no indication this Code has ever been revised, amended, or updated.  This Code of Conduct does not state who at MetLife is bound by it.  This Code of Conduct provides in relevant part:

**The Code and the Law**

\*     \*     \*

As a MetLife employee, you have a responsibility to:

17

Be knowledgeable about and follow all policies that affect your work responsibilities.

Be aware of the legal and regulatory requirements of the country and region where you work and that affect your business.

Disclose or raise concerns about any potential violations of law or policy, or any other potential issues, consistent with requirements of local law.

\*     \*     \*

**Ethical Conduct**

For almost 150 years, MetLife has built a reputation as a company that believes in fair dealing, integrity, and trustworthiness. ***Each of us has a personal responsibility to adhere to the highest standards of ethical conduct and to raise concerns about violations of law, policy, and our Code.  We firmly believe that this is the only acceptable way of doing business***.

\*     \*     \*

**Integrity and Honesty**

MetLife's reputation depends on maintaining the highest standards of conduct in all of our business endeavors. You have a personal responsibility to protect this reputation by "doing the right thing" and acting as a good partner every time you work with our customers, business contacts, and each other. We expect you to conduct yourself with honesty and integrity in all aspects of your job. You should never take unfair advantage of anyone or any entity, including assisting others in doing so, through manipulation, wrongful concealment, abuse of privileged or confidential information, or any sort of misrepresentation.

\*     \*     \*

**Personal Responsibility**

**Raising Concerns about Illegal or Unethical Behavior**

MetLife has built a reputation as a company that maintains the highest standards of honesty and integrity in everything it does. Each of us has a personal obligation to protect this reputation by strongly supporting a culture where concerns can be raised without fear of retaliation.  Consistent with applicable laws, if you suspect or become aware of a violation of law, regulation, Company policy, or this Code by a fellow employee or by MetLife, it is your responsibility to immediately bring your concerns to the appropriate point of contact. It is also important to speak up whenever you have reason to think that actions performed on behalf of MetLife

4840-6156-1262, v. 1

may be illegal, unethical, or otherwise violate law, policy, or this Code. Regardless of whether the wrongdoing is intentional, we must make sure that neither you nor MetLife sanctions or appears to sanction any misconduct. Whenever in doubt about the appropriate ethical or legal choice to make, you should seek management's guidance until guidance is obtained. When we bring our concerns to management's attention, we help to make sure that MetLife operates in accordance with the highest ethical and legal standards.

\*     \*     \*

**Financial Strength**

**Financial Strength Rooted in Ethical Behavior**
**Financial Management and Disclosure**

As a large financial services company, we must maintain strict compliance with all laws and regulations governing disclosure, financial reporting, and records. You must exercise responsible use of, and control over, any financial records to which you have access.

**Accounting Standards**

We maintain our accounting records and prepare MetLife's financial statements in accordance with accounting principles generally accepted in the U.S. We also follow the statutory or other accounting principles set forth by appropriate regulatory bodies. If you have a reason to believe that there are violations of either law or policy regarding MetLife's financial records or operations, you should promptly report such information as identified in the "How to Report" section of this Code.

\*     \*     \*

**Earning the Public Trust**

**Appropriate Sales Activities**

As a renowned financial services provider, we have established our success by allowing our honest reputation for providing quality to speak for itself.  While we should promote our products and services robustly and effectively, our Company expects each of us to do so in ways that are consistent with MetLife's high standards for honesty and integrity. ***In conducting all business, we must only make statements that are factual, truthful, and completely accurate***. This includes not unfairly bolstering our offerings by disparaging our competitors. In order to most effectively communicate to the public, we must each take steps to be appropriately informed about MetLife's latest service offerings and products, and be mindful of current and emerging laws and practices that may affect the way we conduct our

19

business. [emphasis added]

49.     This Code of Conduct requires annual certification.

**Financial Management Code of Professional Conduct**

50.     MetLife's Financial Management Code of Professional Conduct ("Financial Code of Conduct") appears on its website.  There is no indication this Code has been revised, amended, or updated since it was first posted on the website.

51.     The Financial Code of Conduct provides in relevant part:

This Code of Professional Conduct applies to the Chief Executive Officer, the Chief Financial Officer, the Chief Accounting Officer, the Corporate Controller, the Financial Officers and Controllers of each business unit, and all professionals in a finance, accounting, treasury, tax, actuarial, audit or investor relations role in the MetLife enterprise. Such professionals are expected to adhere to this Code, take personal responsibility for conducting the business endeavors of MetLife fairly, promote a culture of honesty and accountability, and act and advocate that others act in conformity with the core values of MetLife and this Code. These professionals are also expected to adhere to the MetLife Employee Code of Business Conduct and Ethics as well as all other applicable MetLife policies and guidelines.

Every employee involved in financial management in the MetLife enterprise shall:

- Act honestly and ethically, avoid or resolve actual or apparent conflicts of interest in personal and professional relationships, and promptly disclose any material transaction or relationship that reasonably could be expected to give rise to such a conflict of interest to the General Counsel or as provided in the Employee Code of Business Conduct and Ethics.

- Promote and provide appropriate disclosures to stakeholders that present fairly the information therein (*e.g.*, accurately, completely, objectively, relevantly, timely and understandably), in accordance with applicable laws, rules and regulations.

- Comply with applicable laws, rules and regulations of federal, state, foreign and local governments, and private and public regulatory agencies.

- Adhere to, and, where applicable, monitor and improve, MetLife's processes to maintain effective internal control over financial reporting.

- Act in good faith, responsibly, with due care, competence and diligence, using considered, professional, independent judgment, and seek at all times to present all reasonably available material information on a timely basis to management and others in accordance with MetLife policies.

52.     This Financial Code of Conduct does not require annual certification.

**Audit Committee Charter**

53.     MetLife's Audit Committee Charter (as published on its website) states that it was reviewed, amended and restated effective October 23, 2018.  MetLife has not provided information regarding the amendments made to this charter.   Generally, MetLife's Audit Committee is responsible for overseeing the adequacy of the Company's internal controls over financial reporting, the accuracy of its public disclosures, and oversight of risk assessment and risk management.  The Audit Committee Charter states in relevant part:

> **Committee Authority and Responsibilities**
>
> In carrying out its responsibilities, the Committee shall:
>
> *     *     *
>
> With respect to the Company's internal control over financial reporting, the Committee shall review and discuss with management, the internal auditor and the independent auditor:
>
> Management's reports evaluating the adequacy and effectiveness of the Company's internal control over financial reporting, including any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting that could adversely affect the Company's ability to record, process, summarize and report financial information.
>
> The independent auditor's reports concerning the adequacy and effectiveness of the Company's internal control over financial reporting.
>
> Management's reports concerning the prevention and detection of fraud against the Company, including reports of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.
>
> Regular updates from management, the internal auditor and the independent auditor regarding status of any remediation plans for any material weaknesses and significant deficiencies in the design and operation of internal control over financial reporting.

\*       \*       \*

With respect to the Company's internal control over financial reporting, the Committee shall review and discuss with management, the internal auditor and the independent auditor:

- Management's reports evaluating the adequacy and effectiveness of the Company's internal control over financial reporting, including any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting that could adversely affect the Company's ability to record, process, summarize and report financial information.

- The independent auditor's reports concerning the adequacy and effectiveness of the Company's internal control over financial reporting.

- Management's reports concerning the prevention and detection of fraud against the Company, including reports of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

- Regular updates from management, the internal auditor and the independent auditor regarding status of any remediation plans for any material weaknesses and significant deficiencies in the design and operation of internal control over financial reporting.

With respect to the Company's financial statements and disclosures of financial information, the Committee shall:

- Discuss with the independent auditor, and with the internal auditor, in each case out of the presence of management if deemed appropriate…(b) the Company's internal control over financial reporting, and the budget, staffing and quality of the Company's internal audit function; and (c) any "management" or "internal control" letter issued or proposed to be issued by such auditor to the Company, and management's response thereto.

\*       \*       \*

- Review any material financial or other arrangements of the Company that do not appear on the Company's financial statements, any reports by management, the internal auditor or the independent auditor regarding any such arrangements of the Company that do not appear on the Company's financial statements, and any transactions or courses of dealing with third parties that are significant in size or involve terms or other aspects that differ from those that would likely be negotiated with independent parties, and that are relevant to an understanding of the Company's financial statements.

- Review management's reports evaluating the effectiveness of the Company's disclosure controls and procedures in assuring that material information required to be disclosed in the Company's periodic reports filed with the Commission is reported to management, appropriately processed and summarized by management and reflected in such reports filed with the Commission within the specified time periods.

- Discuss with management, the internal auditor and the independent auditor the Company's quarterly reports on Form 10-Q and the interim financial information contained therein, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," or authorize the Committee Chair to discuss the foregoing with management, the internal auditor and the independent auditor and make a report thereon to the full Committee, prior to the filing of such quarterly reports with the Commission.

- Discuss with management the Company's practices regarding earnings press releases as well as the financial information and earnings guidance management provides to analysts and rating agencies.

- Discuss with management, the internal auditor and the independent auditor the audited financial statements to be included in the Company's annual reports on Form 10-K, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of such reports with the Commission and discuss with the independent auditor the matters required to be discussed by the applicable PCAOB standards.

- Based on its discussions with management, the internal auditor and the independent auditor and upon receipt of an opinion of the Company's independent auditor on the Company's financial statements, in form and content satisfactory to the Committee, determine whether to recommend to the Board that the Company's audited financial statements be included in the Company's Annual Reports on Form 10-K for filing with the Commission.

The Committee also shall:

- Periodically discuss the guidelines and policies with respect to the process by which the Company undertakes risk assessment and risk management.

- Review the financial condition of the Company.

- Review with management, the internal auditor and the independent auditor any correspondence with regulators or governmental agencies and any

employee complaints or published reports that are brought to its attention that raise material issues regarding the Company's financial statements or accounting policies.

- Receive reports from the Company's General Counsel concerning significant legal and regulatory matters.

- Review the Company's policies on ethical business conduct and review reports concerning the monitoring of compliance with such policies.

## Governance and Corporate Responsibility Committee Charter

54. MetLife's Governance and Corporate Responsibility Committee Charter (as published on its website) states that it was reviewed, amended, and restated effective October 23, 2018. MetLife has not provided information regarding the amendments made to this charter. The Governance and Corporate Responsibility Committee Charter states in relevant part:

**Role of the Governance and Corporate Responsibility Committee**

The Governance and Corporate Responsibility Committee (the Committee) is appointed by the MetLife, Inc. (the Company) Board of Directors (the Board) to assist the Board by … (iii) developing, and recommending to the Board for adoption, corporate governance guidelines applicable to the Company; … (vi) overseeing the Company's compliance responsibilities and activities, including its legislative and regulatory initiatives, sales practices, and ethics and compliance programs. […]

\*   \*   \*

**Committee Authority and Responsibilities**

In carrying out its responsibilities, the Committee shall:

Board Governance

for each Board committee, advise the Board with respect to the committee charter […]

\*   \*   \*

develop and recommend to the Board a set of corporate governance guidelines and recommend to the Board changes to the guidelines as the Committee deems necessary or desirable;

oversee the evaluation of the Board and establish the procedures by which the evaluations will be conducted;

annually review each Board committee charter in cooperation with that committee and recommend proposed changes to the Board.

*      *      *

periodically review the Board's leadership structure and recommend changes to the Board as appropriate, and, if the Chairman of the Board is not an independent Director, make a recommendation regarding a Lead Director, who shall be elected by a majority of the independent Directors;

*      *      *

Corporate Governance, Regulatory and Compliance

*      *      *

review the Company's sales practices for consistency with appropriate industry standards;

review the Company and its subsidiaries' ethics and compliance programs; review and approve the annual compliance plan;

## Compensation Committee Charter

55.    MetLife's Compensation Committee Charter (as published on its website) states that it was reviewed, amended, and restated effective October 23, 2018.  MetLife has not provided information regarding the amendments made to this charter.   The Compensation Committee Charter states in relevant part:

**Role of the Compensation Committee**

The Compensation Committee (the Committee) is appointed by the MetLife, Inc. (the Company) Board of Directors (the Board) to assist the Board in fulfilling its responsibility to oversee the compensation of the Company's executive officers and other employees of the MetLife enterprise.

*      *      *

**Committee Authority and Responsibilities**

25

In carrying out its responsibilities, the Committee shall:

\*      \*      \*

with respect to the Chief Executive Officer:

- approve the corporate goals and objectives relevant to the Chief Executive Officer's total compensation;

- evaluate the Chief Executive Officer's performance in light of such goals and objectives; and

- endorse, for approval by the independent directors, the Chief Executive Officer's total compensation level based on such evaluation[.]

review and recommend approval by the Board of the total compensation of each person who is an "executive officer" of the Company under the Exchange Act, and the rules promulgated thereunder, each person who is an "officer" of the Company under Section 16 of the Exchange Act, and the rules promulgated thereunder, including their base salaries, annual incentive compensation, and long-term equity-based incentives[.]

\*      \*      \*

oversee management's efforts to ensure that the Company's compensation programs do not encourage excessive or inappropriate risk-taking[.]

## DUTIES OF THE DIRECTOR DEFENDANTS

56.     By reason of their positions as officers, directors, and/or fiduciaries of MetLife and because of their ability to control the business and corporate affairs of MetLife, the Director Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage MetLife in a fair, just, honest, and equitable manner.  The Director Defendants were and are required to act in furtherance of the best interests of MetLife and its shareholders.

57.     Each director and officer of the Company owes to MetLife and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

26

Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

58.     The Director Defendants, because of their positions of control and authority as directors and/or officers of MetLife, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with MetLife, each of the Director Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of MetLife.

59.     To discharge their duties, the officers and directors of MetLife were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of MetLife were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     Remain informed as to how MetLife conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

60.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of MetLife, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

61.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed herein.  The Director Defendants' subjected the Company to the costs of, *inter alia*, defending, and the potential liability from, the securities class action (and related lawsuits).  As a result, MetLife has expended, and will continue to expend, significant sums of money.

62.     The Director Defendants' actions have irreparably damaged MetLife's corporate image and goodwill.

**COMPANY BACKGROUND AND INFORMATION**

**MetLife General Business Background**

63.     As described in its 2017 Form 10-K, MetLife is one of the world's leading financial services companies, providing its customers with insurance, annuities, employee benefits and asset management products and services.  MetLife's business within the United States is organized into three main segments: the RIS, the Group Benefits and Property & Casualty.

64.     From inception until October 5, 2016, when MetLife underwent a corporate reorganization, pension risk transfers were part of MetLife's CBF business. Following the reorganization, pension risk transfers became part of a new business, RIS.

65.     MetLife's RIS business ". . . provides funding and financing solutions that help institutional customers mitigate and manage liabilities primarily associated with their qualified, nonqualified and welfare employee benefit programs using a spectrum of life and annuity-based insurance and investment products." *See* 2017 Form 10-K at p. 8.

66.     During the Relevant Period, MetLife Executive Vice President Lenna oversaw the CBF business (which then included the now-named RIS segment) and later the RIS business. Lenna reported to the head of MetLife's U.S. business.  In addition, Lenna was authorized by the

Company to comment publicly on MetLife's behalf with respect to its CBF and RIS businesses, including, for example, in July 28, 2017 and September 26, 2016 press releases issued by MetLife.

67.     From November 2011 to April 2015, William J. Wheeler ("Wheeler") served as the head of MetLife's U.S. business.  Following Wheeler's departure from the Company, Maria Morris ("Morris") served as the interim head of MetLife's U.S. business until June 2017.  Beginning in June 2017, Michel Khalaf ("Khalaf"), former head of MetLife's Middle East, Africa and South Asia business, was appointed head of MetLife's U.S. business.  Wheeler, Morris and Khalaf, were all executive officers of MetLife during their respective tenures as head of MetLife's U.S. business, and all reported to Defendant Kandarian.  Khalaf was also an executive officer of MetLife and reported to Defendant Kandarian in his prior role.

68.     Beginning on March 25, 2014, Wayne Daniel ("Daniel") was appointed as MetLife's Vice President of U.S. Pensions, with responsibility for overseeing MetLife's pension risk transfer business.  Beginning at that time, and through the end of the Relevant Period, Daniel reported to Lenna.  In addition, Daniel was authorized by the Company to comment publicly on MetLife's behalf with respect to its pension risk transfer business, including, for example, in a June 21, 2016 MetLife press release announcing a pension risk transfer between the Company and PPG Industries, Inc., which involved MetLife assuming $1.6 billion in pension obligations.

69.     The product line of MetLife's RIS business includes Pension Risk Transfers, which is the subject of this litigation and turns employer defined benefit pension plans into group annuity contracts ("GACs").  Plan administrators use employer pension plan funds to finance the purchase of large GACs from MetLife.  The Pension Risk Transfer process results in employers closing out their pension liabilities and plan beneficiaries becoming entitled to annuity benefits as they reach retirement age.  On its website, MetLife describes this as follows:

Your company is transferring the responsibility for the payment of your Defined Benefit Plan's pension benefits to us.  A MetLife insurance company will issue an annuity to your company, and we will become responsible for guaranteeing your benefit, making payments to you, and providing all services related to your Defined Benefit Plan's benefits.[2]

70.    GACs are contracts negotiated between the former defined benefit pension plan provider and MetLife.  Plan participants, including retirees, are not themselves party to the GACs and may be unaware that responsibility for the administration of their retirement benefits has moved from their employer to MetLife.

71.    Pension risk transfers were important to MetLife's overall business during the Relevant Period.  Indeed, when Daniel was interviewed in June 2014 by *Plan Sponsor*, an industry magazine, he stated that "pension risk management—which includes both pension risk transfer and risk mitigation strategies—*is a core element of MetLife's business* and has been for over 90 years . . . *MetLife has a 45% market share and is a leading pension risk transfer provider*."[3] Further, according to Lenna, MetLife was managing nearly $38 billion of transferred pension liabilities as of June 2016.

72.    Defendants also recognized the importance of MetLife's pension risk transfers business during the Relevant Period.  For example, during an investor conference call on September 6, 2017, Hele stated that "the other business that gets a lot of attention is the pension risk transfer business. . . .  We like that business, it's a solid business.  […]  We've been selling roughly between $1.5 billion to $2 billion a year in that.   And we appear—we would think we're kind of on track for that range for this year as well.   So we like the business."

73.    Likewise, Defendant Kandarian stated during an investor conference call on

---

[2]      *See* https://www.metlife.com/retirement-and-income-solutions/pension-risk/pensions-center/

[3]      All emphasis is added unless otherwise noted.

February 13, 2014, that "[Pension risk transfers] is a sector that MetLife has been a major player in historically. *We were the largest again last year in 2013 in terms of the pension closeout business*." Wheeler echoed these sentiments during a separate investor conference call on February 13, 2014, stating that "We did I think $1.7 billion, $1.8 billion in pension closeouts in 2013. By the way, *that made us the market share leader in 2013*. We do see this as an area of growth. And I think—in the US and I think that is going to continue for quite some time."

74.     Analysts also viewed pension risk transfers as being critical to the Company. For example, according to Barclays analyst Jay Gelb's June 10, 2014 report on MetLife's then-CBF business (now the RIS business practice), he stated, in pertinent part, as follows:

> Corporate Benefit Funding (18% of 2015E Earnings) − ***Upside from Pension Closeout Deals***
>
> Corporate Benefit Funding offers pension risk solutions, structured settlements, stable value and investment products. It also provides other benefit funding products for the investment management of defined benefit and defined contribution pension plans. This business has a large allocation of alternative invested assets, including limited partnership interests and real estate joint ventures, which can generate significant income in favorable markets.
>
> MET anticipates moderate operating earnings growth in the near-term and 3-5% growth in the long-term (***with significant upside from pension closeout deals***). The pension risk market should be robust even if there are no jumbo deals with each $1bn of pension closeout sales translating to approximately $10mn of annual operating earnings. Our understanding is MET prices pension closeout deals to achieve a 12%+ ROE based on assumed long-term investment return (contracts are approximately 30 years duration), and mortality assumptions (rate at which people die).

75.     Likewise, according to J.P. Morgan analyst Jimmy Bhullar's November 10, 2017, report on a recent meeting he had with Hele, "[m]anagement's tone was upbeat, and the meetings reinforced our positive long-term view of MetLife. MetLife is especially optimistic about growth in the group insurance, *pension risk transfer*, and third-party asset management businesses."

76.     Accordingly, at all relevant times during the Relevant Period, in matters related to the GACs and pension risk transfers, MetLife assumes the employer pension plan obligations and is responsible for paying retirement benefits to plan beneficiaries.  Generally, companies provide MetLife with information related to their employee benefits plans, which MetLife uses to administer the GACs and effect payments. MetLife is required to maintain adequate funds in its pension reserve accounts to pay future claims and liabilities pursuant to its GAC obligations. When a pension risk transfer agreement is consummated, MetLife establishes a liability (*i.e.*, an accounting reserve) to account for the future policy benefits that are to be paid to pension annuitants.  At some later date, MetLife reduces this liability (also referred to as releasing its accounting reserves) when it determines that a pension risk transfer annuitant has died.  The annuitant's death terminates the Company's obligation to pay additional pension benefits to this person.  MetLife's earnings' increase commensurate with the reduction in its future pension benefits liability. Pension risk transfers were important to MetLife's overall business.  MetLife executives have been quoted as saying ". . . pension risk management – which includes both pension risk transfer and risk mitigation strategies – is a core element of MetLife's business and has been for over 90 years."

**MetLife's Historical Improper Business Practices**

77.     The Multi-State Investigation started with regulatory inquiries of MetLife's insurance business practice in Florida.  As described on the Florida Office of Insurance Regulation website, "[i]n 2009 a Florida market conduct investigation revealed that life insurance companies [including MetLife] were not taking adequate steps to try to pay out on life insurance policies where information in the companies' possession indicated that the insureds had died but no claim had been filed.  Often, these companies were using information from the Social Security

33

Administration's Death Master File ("SSA-DMF") to stop paying a deceased person's annuity, but not using it to search for beneficiaries of a life insurance policy and initiate an investigation as to whether benefits were due."[4]   The Multi-State Investigation soon expanded to states including Illinois, California, Pennsylvania, New Hampshire and North Dakota.  *See* Exhibit 2.

78.     The national Technical Information Service (government) website describes the SSA-DMF as ". . . an important tool used for verifying death," and goes on to state, "Pension funds, insurance companies, Federal, State, and Local government agencies and others responsible for providing benefits or making benefit payments to retirees, recipients, or beneficiaries also use the DMF to verify if someone receiving a benefit or payment is deceased."[5]

79.     The Multi-State Investigation focused on whether MetLife violated various laws by using the SSA-DMF to benefit the Company while purposely not using the SSA-DMF when it would be to the Company's detriment.  Through the Multi-State Investigation, it was revealed that MetLife used the SSA-DMF to identify recently deceased annuitants whose benefits did not survive their death (so that MetLife could stop annuity payments, resulting in the remainder of the annuity contributing to MetLife's earnings).  However, MetLife was not using the SSA-DMF to identify individuals who had annuity contracts with death benefits, or life insurance policies, but who never contacted MetLife upon the policyholder's death.  As a result, MetLife did not pay death benefits  to their beneficiaries.

80.     As part of the Multi-State Investigation, on May 19, 2011, Todd Katz ("Katz", MetLife's then Executive Vice President U. S. Business Insurance Products) and Frank Cassandra ("Cassandra", MetLife's then Senior Vice President Insurance Products Financial) testified at a

---

[4]      *See*
https://www.floir.com/sections/landh/life_claims_settlement_practices_hearing05192011.aspx
[5]      *See* https://classic.ntis.gov/products/ssa-dmf/#

public hearing before then Insurance Commissioner Kevin McCarty.

81.     Katz testified on May 19, 2011 that MetLife routinely used the SSA-DMF each month to identify deceased group annuitants so that the Company could stop making payments to these people.  Katz's testimony suggested that, at all relevant times, MetLife was using the SSA-DMF to ascertain whether pension risk transfer annuitants had died so that they could stop paying benefits, but was not using the SSA-DMF to ensure that those annuitants who were presumed dead were actually deceased.  Specifically, Katz testified, among other things, as follows:

**Commissioner McCarty**:  Okay. […] we'll explore that with the different products. That would probably be great.  ***Does MetLife use the Social Security Death Master File information for group annuities?***

**Mr. Katz**:  ***We do***.  And I probably should talk a little bit about why we do and how that works, if that would be okay.  For group annuity business, group annuities are typically claims that for the most part are in pay-off status; and so in a similar reason for using it as Social Security Administration has indicated, ***we use it as a means to prevent duration errors***.  If you think about the death – the annuity business almost getting a regular check each month, ***and if we receive an indication of death, that an individual has an annuity, we will suspend that payment*** and write to the family to assure that the death occurred. And I should clarify that. The rationale for that is if we didn't and continued with payments, by definition, if we were making payments to people who were dead, those would be duration errors, they would be inappropriate payments, and they also could put the beneficiary in a bad spot because they are getting money that actually isn't theirs

**Commissioner McCarty**: Right.  Understood.  Without – I understand that's a large corporation and as you already specified.  And just in general, ***how long has MetLife used the Death Master for group annuities?***

**Mr. Katz**: To the best of my knowledge, ***we have been using it since the late '80s***.

**Commissioner McCarty**: Okay.

**Mr. Katz**: I can't give you an exact year.

**Commissioner McCarty**: That's fine. ***Does MetLife have written policies and procedures as it relates to the use of the Death Master File for group annuities***?

**Mr. Katz**: ***I believe we do, yes***.

\*     \*     \*

**Commissioner McCarty**: What is the match-up rate timeline [for the DMF] for today?

**Mr. Katz**: Currently, for group annuities, we are matching once a month.

**Commissioner McCarty**: Once a month. Okay. What do you do when you get a match? I presume you would stop making the annuity payment.

**Mr. Katz**: For a group annuity, we consider a match an indication of death. We suspend the annuity payment. We write to the family indicating that we have done that.

82.     Katz's testimony at the May 19, 2011 hearing demonstrates that during the Relevant Period, MetLife had access to the SSA-DMF and was actively using it since the 1980s to ensure that MetLife was not paying group annuitants, which include pension risk transfer annuitants, after they died.  Katz's testimony further establishes that MetLife was receiving the SSA-DMF monthly report with the names of all pension risk transfer annuitants who died since the last report.  This report did not include the names of the pension risk transfer annuitants who were improperly being presumed to have passed away simply because they did not respond to two form letters.

83.     Indeed, despite the Company's prolific use of the SSA-DMF, Defendants never used the SSA-DMF to confirm that missing pension risk transfer annuitants – who are also group annuitants – had actually passed away. In other words, the Company could have easily used the SSA-DMF to confirm that pension risk transfer annuitants were actually deceased after receiving no response to the two form letters, but consciously and recklessly chose not to do this.  Instead, the Company only used the SSA-DMF when it benefitted MetLife's interests.

84.     In addition, Katz's testimony establishes that, in the event MetLife believed a group annuitant was deceased, the Company was supposed to contact the families of annuitants to ensure that the death had in fact occurred.  As Defendants confirmed at the end of the Relevant Period,

36

this never happened for pension risk transfer annuitants, who were instead presumed dead after two form letters were not responded to, with MetLife taking no other action.

85.     Katz's testimony establishes that Director Defendants knew, or were reckless in not knowing, that the Company's practice for locating pension risk transfer annuitants was improper at all relevant times during the Relevant Period.

86.     Through the Multi-State Investigation, on April 19, 2012, MetLife entered into the 2012 Settlement Agreement with these six state insurance departments, agreeing to pay nearly $500 million, with $40 million to compensate the states for the cost of the Multi-State Investigation and the remainder to pay policyholders whose benefits were wrongly withheld.  A copy of the 2012 Settlement Agreement is attached hereto as Exhibit 2.

87.     As part of the 2012 Settlement Agreement, MetLife was required to conduct a "Thorough Search" for its beneficiaries.  This thorough search went far beyond MetLife's two (2) letter approach as described above and requires:

> A Thorough Search shall include any methodology believed likely to locate a Beneficiary.  A Thorough Search will be completed the earlier of when (1) a Beneficiary has been located, or (2) the following steps, at a minimum, have been performed:
>
> (i)     The Company has used its best efforts to identify the Beneficiary and determine a current address for the Beneficiary based upon the Company's records, including but not limited to internal databases;
>
> (ii)    The Company has made two (2) attempts to contact the Beneficiary in writing at the address contained in Company's records or at the address determined in (i) above; provided that, if such writing is returned as undeliverable, the Company will not be required to send any additional mailings to that address and will within thirty (30) days update the address using online search or locator tools, including but not limited to the DMF Update File, Lexis Nexis, Accurint or other comparable databases;
>
> (iii)   In the event that no response is received to the writings specified in (ii.) above, or a writing is returned as undeliverable and no updated address can be located, the Company has attempted to contact the Beneficiary by any telephone number contained in Company's records, including but not

limited to its internal databases, provided that each attempted contact shall be logged;

(iv) In the event that no response has been received to the attempted contacts described above, the Company shall attempt to contact the Beneficiary at the most current e-mail address, if any;

(v) Send a third and final letter to the Beneficiary at the most current address available to the Company via certified mail; provided, however, that, subject to contrary state law requirements, such letter may be sent by first class mail if, at some point prior to sending it, the Company has accessed a commercially available database service, which is used to update addresses in order to check for a more current address for the Beneficiary.

88.     MetLife's agreement to conduct a "Thorough Search" as part of the 2012 Settlement Agreement meant that the Company began using certified mail, electronic mail, telephone and online databases to identify and contact annuitants, starting before the beginning of the Relevant Period.  But MetLife did not do this for pension risk transfer annuitants, because MetLife specifically excluded pension risk transfer annuitants from the 2012 Settlement Agreement (*see* Exhibit 2 at p. 3, 2012 Settlement Agreement – Annuity Contract definition).

89.     Plainly stated, as MetLife was improving its location practices for most annuitants, it deliberately excluded pension risk transfer annuitants. Instead, for pension risk transfer annuitants it left in place the same two letter practice that the 2012 Settlement Agreement was designed to remediate, and that Defendants knew, or recklessly disregarded, to be inadequate.

90.     At the time of the 2012 Settlement, Kandarian, Grisé, Hubbard, Kilts, and Kinney were members of MetLife's Board.  Directors Gutierrez and Kennard joined the MetLife Board shortly thereafter in 2013, followed by Morrison in 2014.

91.     Certain events surrounding the Multi-State Investigation and the 2012 Settlement Agreement also form part of the underlying factual events at issue in the 2012 Litigation, which is currently pending before the Honorable Lewis A. Kaplan in the United States District Court for the Southern District of New York.

92.     Specifically, the 2012 Litigation involves a class of investors alleging Exchange Act claims against MetLife and Wheeler (among others) for a putative Class Period of February 9, 2011 to October 6, 2011.  During this time, Wheeler served as the Company's CFO and was responsible for, among other things, ensuring that the Company's financial statements were prepared in accordance with GAAP and were accurate.

93.     The 2012 Litigation also involves a class of investors alleging Securities Act of 1933 ("Securities Act") claims against MetLife, Wheeler and Defendant Kandarian (among others) for a putative Class Period of February 2, 2010 to October 6, 2011.  During this time, Defendant Kandarian served in various roles including as MetLife's Chief Investment Officer and CEO.

94.     Among other things, the 2012 Litigation alleges that MetLife's financial statements were materially false and misleading, that the Company made misstatements and omissions regarding MetLife's reserve setting practices, and that certain MetLife SEC filings violated Item 303 of SEC Regulation S-K, among other SEC regulations.

95.     Currently, fact discovery is underway in the 2012 Litigation. The Securities Act class in the 2012 Litigation was certified by Judge Kaplan on September 22, 2017.  The Exchange Act class in the 2012 Litigation was certified by Judge Kaplan on January 7, 2019, after the parties stipulated to class certification on January 3, 2019.

96.     Counsel for Wheeler, MetLife and Defendant Kandarian in the 2012 Litigation are the same counsel that are representing Defendants in this action.

97.     On September 25, 2018, Wheeler, MetLife and Defendant Kandarian, among the other defendants in the 2012 Litigation, filed an answer to the operative complaint (the "2012 Answer").  In the 2012 Answer, Wheeler, MetLife and Defendant Kandarian admit, among other things, that "MetLife has accessed the SSA-DMF for specific purposes since the 1980s" and that

39

"Todd Katz . . . testified at a public hearing held on behalf of the Florida Office of Insurance Regulation and the National Association of Insurance Commissioners on May 19, 2011 pursuant to subpoena."

### The September 26, 2016 Internal Audit Report Confirms that Defendants Knew About, or Recklessly Disregarded, Material Weaknesses in Internal Controls of Its Pension Risk Transfer Business

98.     On September 26, 2016, the Audit Committee of the Board was "presented with an 'Internal Auditor's Report' by Karl Erhardt, Executive Vice President & Chief Auditor at MetLife" (the "Internal Audit Report").  Attached hereto as Exhibit 3.

99.     At that time, MetLife's Audit Committee consisted of Defendants Grisé, Kinney, and Kelly, and Defendant Kandarian was the Chairman of the Board.  All of them were in attendance at the September 26, 2016 Audit Committee meeting.

100.     Erhardt was a senior MetLife executive during the Relevant Period.  According to his LinkedIn profile, Erhardt has been a MetLife Executive Vice President and Chief Auditor since 2002.  A Form D filed by MetLife on October 5, 2018 listed Defendant Kandarian, Khalaf, John McCallion (Hele's successor as MetLife's CFO) and Erhardt as executive officers of MetLife.  In addition, on September 30, 2011, Erhardt and Wheeler were copied on a letter sent by MetLife to the Public Company Accounting Oversight Board ("PCAOB").  The letter listed Erhardt as MetLife's "General Auditor."  Moreover, Erhardt was described the same way in a July 8, 2013 letter sent by MetLife to the PCAOB that also copied Hele.

101.     The Internal Audit Report identified "control weaknesses" that existed in MetLife's internal controls "'over several areas, including contract accuracy, manual certificate mailings, and retirement letter mailings (*e.g.*, age 65 and 70.5).  The report also provided that "[o]pportunities exist to enhance existing controls to ensure timely processing of held and suspended payments as

well as retirements."   Additionally, the report suggested that "management should enhance procedures to clearly identify when transaction processing for a contract transfers to the Closeout Administration team."

102.   The Internal Audit Report noted that MetLife's Internal Audit department "reviewed the design and operating effectiveness of controls over CBF's [] Platform Closeout Implementation and Administration processes for the period January 2015 through December 2015.  [The] review and evaluation included case implementation, updating and tracking of participant requests, disbursement process, manual controls over ACE administrative feeds to reserves and general ledger, and management oversight and reporting.'"

103.   The Internal Audit Report clearly informed MetLife's Audit Committee, the members present at the meeting, and Kandarian of the Company's material weaknesses in its internal control.  Yet MetLife's Audit Committee and the Board did not take any subsequent follow up action or otherwise implement remedial measures to address the identified control weaknesses. Indeed, MetLife's Audit Committee did not even discuss the identified, apparent issues material to its business operation in any subsequent Audit Committee meetings until the issue came to light in January 2018.

104.   The Internal Audit Report—providing detailed analysis concerning MetLife's material weakness in internal control system—establishes the Audit Committee members' knowledge of the Company's improper business practice in inadequately locating pension risk transfer annuitants.  The Board, as a result, knew or was reckless in not knowing, the Company's internal control weaknesses as identified in the Internal Audit Report.  Indeed, in the Internal Audit Report, MetLife's General or Chief Auditor raised the concerns concerning the Company's compliance directly with the Audit Committee.  The Internal Audit Report in 2016 reached the

41

highest levels of MetLife, ***once again***, establishing the Board's knowledge of the Company' illegal and improper practice well before the Company's January 29, 2018 press release, admitting to the investors for the first time of the known material weaknesses in MetLife's internal controls.

105.     The persistent and false public statements the Defendants caused MetLife to make during the Relevant Period stand in contrast to the material weaknesses of internal control identified in the Internal Audit Report.  Those public statements and omissions (*e.g.*, the Form 10-Ks discussed below) represented that Kandarian and the other members of the management evaluated the effectiveness of MetLife's internal controls and concluded that they were effective. In light of the Board's knowledge of the Company's weaknesses in its internal controls, MetLife's public disclosures were materially false and misleading.

106.     During the time the Internal Audit Report was presented to the Audit Committee, the following defendants were members of the Board: Defendants Kandarian, Grisé (member of the Audit Committee), Gutierrez, Herzog (Chairman of the Audit Committee and member of the Finance & Risk Committee), Hubbard (member of the Finance & Risk Committee), Kelly (member of the Finance & Risk Committee), Kennard (member of the Finance & Risk Committee), Kilts, Kinney (member of the Audit Committee and a member of the Finance & Risk Committee) and Morrison.

## THE FALSE AND MISLEADING STATEMENTS DEFENDANTS CAUSED METLIFE TO MAKE

107.     As a separate and related matter, and upon information and belief, beginning in 2013, the DOL's Philadelphia office began receiving questions from pensioners asking why they were not receiving their pension benefits. By 2015, the DOL's Philadelphia office opened an investigation into the matter.  Because of this investigation, MetLife launched an internal pilot program in August 2016 to address this issue, which was never disclosed to investors during the

Relevant Period (the "Pilot Program").  The Pilot Program involved using additional data sources to locate missing pension risk transfer annuitants beyond the Company's standard practice of sending two form letters and then presuming death when there was no response.

108.    The number of pension risk transfer annuitants identified by the Pilot Program who were improperly presumed as deceased has not been disclosed by MetLife.  And while the Pilot Program was progressing, MetLife continued to improperly release reserves that had been held for pension risk transfer annuitants, presumably because MetLife considered these annuitants dead after not responding to two form letters.

## METLIFE'S PUBLIC STATEMENTS

109.    Nonetheless, *The Wall Street Journal* reported that the results of the Pilot Program contributed to the Company's decision to disclose in the 12/15/2017 Form 8-K that MetLife's pension risk transfer practice was improper and required remediation.

110.    At all relevant times that the Pilot Program was underway at MetLife, the Company nonetheless continued to improperly release reserves that had been held for pension risk transfer annuitants because these annuitants were being presumed as dead after not responding to two form letters.

111.    The Pilot Program further establishes that Defendants knew, or were reckless in not knowing, that the Company's practice for locating pension risk transfer annuitants was improper at all relevant times during the Relevant Period.

112.    Further, Defendant Kandarian knew, or was reckless in not knowing, that the DOL investigation posed a significant risk to MetLife's business.  As the former executive director of the PBGC, where he directly reported to the Chairman of the DOL, Defendant Kandarian was aware, or should have been, of the importance of MetLife paying pension benefits on time and

43

accurately.  By allowing MetLife's pension risk transfer practice for locating annuitants to prevent the timely and accurate payment of pension benefits, Defendant Kandarian acted recklessly during the Relevant Period.

113.    On February 27, 2013, MetLife filed an annual report on Form 10-K for the fiscal year ended December 31, 2012 (the "2012 Form 10-K") with the SEC, which provided the Company's annual financial results and position.  The 2012 Form 10-K was signed by Defendant Kandarian and Hele (MetLife's then Executive Vice President and CFO).  The 2012 Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Kandarian and Hele attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

114.    The 2012 Form 10-K stated the following regarding the Company's controls and procedures:

**Item 9A. Controls and Procedures**

Management, with the participation of the Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e) as of the end of the period covered by this report. Based on that evaluation, *the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective.*

There were no changes to the Company's internal control over financial reporting as defined in Exchange Act Rule 13a-15(f) during the quarter ended December 31, 2012 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Management's Annual Report on Internal Control Over Financial Reporting**

Management of MetLife, Inc. and subsidiaries is responsible for establishing and maintaining adequate internal control over financial reporting. In fulfilling this responsibility, estimates and judgments by management are required to assess the expected benefits and related costs of control procedures. The objectives of internal control include providing management with reasonable, but not absolute, assurance that assets are safeguarded against loss from unauthorized use or disposition, and

that transactions are executed in accordance with management's authorization and recorded properly to permit the preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America.

Management has documented and evaluated the effectiveness of the internal control of the Company at December 31, 2012 pertaining to financial reporting in accordance with the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

***In the opinion of management, MetLife, Inc. maintained effective internal control over financial reporting at December 31, 2012***.  [emphasis added].

115.    On March 22, 2013, MetLife filed its definitive proxy statement on Form DEF 14A with the SEC (the "2013 Proxy").  The 2013 Proxy included proposals for the election of directors and approval of compensation paid to MetLife's named executive officers.  The 2013 Proxy did not disclose any issues or concerns with the effectiveness of MetLife's internal controls.  Instead, MetLife stated "[d]uring 2012, management updated its internal control documentation for changes in internal control and completed its testing and evaluation of MetLife's system of internal control over financial reporting in response to the requirements set forth in Section 404 of the Sarbanes-Oxley Act of 2002 and related regulation."  In the 2013 Proxy, MetLife asked that each voting shareholder approve the MetLife directors up for election and further approve the executive compensation plan.  The Director Defendants who were nominees at this time were Hubbard, Kandarian, Kilts, and Kinney.

116.    On February 27, 2014, MetLife filed an annual report on Form 10-K for the fiscal year ended December 31, 2013 (the "2013 Form 10-K") with the SEC, which provided the Company's annual financial results and position. The 2013 Form 10-K was signed by Defendant Kandarian and Hele.  The 2013 Form 10-K contained signed SOX certifications by Defendant

Kandarian and Hele attesting to the accuracy of financial reporting, the disclosure of any material

changes to the Company's internal control over financial reporting and the disclosure of all fraud.

117.    The 2013 Form 10-K stated the following regarding the Company's controls and

procedures:

### Item 9A. Controls and Procedures

Management, with the participation of the Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e) as of the end of the period covered by this report. Based on that evaluation, *the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective.*

There were no changes to the Company's internal control over financial reporting as defined in Exchange Act Rule 13a-15(f) during the quarter ended December 31, 2013 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

### Management's Annual Report on Internal Control Over Financial Reporting

Management of MetLife, Inc. and subsidiaries is responsible for establishing and maintaining adequate internal control over financial reporting. In fulfilling this responsibility, estimates and judgments by management are required to assess the expected benefits and related costs of control procedures. The objectives of internal control include providing management with reasonable, but not absolute, assurance that assets are safeguarded against loss from unauthorized use or disposition, and that transactions are executed in accordance with management's authorization and recorded properly to permit the preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America.

Management has documented and evaluated the effectiveness of the internal control of the Company at December 31, 2013 pertaining to financial reporting in accordance with the criteria established in *Internal Control — Integrated Framework* (*1992*) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

*In the opinion of management, MetLife, Inc. maintained effective internal control over financial reporting at December 31, 2013.*  [Emphasis added].

118.    On March 25, 2014, MetLife filed its definitive proxy statement on Form DEF 14A with the SEC (the "2014 Proxy").  The 2014 Proxy included proposals for the election of directors and approval of compensation paid to MetLife's named executive officers.  The 2014 Proxy did not disclose any issues or concerns with the effectiveness of MetLife's internal controls.  Instead, MetLife stated "[d]uring 2013, management updated its internal control documentation for changes in internal control and completed its testing and evaluation of MetLife's system of internal control over financial reporting in response to the requirements set forth in Section 404 of the Sarbanes-Oxley Act of 2002 and related regulation."  It confirmed that MetLife's Audit Committee reviewed the report of management's assessment of the effectiveness of internal control over financial reporting contained in the Company's 2013 Form 10-K.   In the 2014 Proxy, MetLife asked that each voting shareholder approve the MetLife directors up for election and further approve the executive compensation plan.  The Director Defendants who were nominees at this time were Grisé, Gutierrez, Hubbard, Kandarian, Kennard, Kilts, Kinney, and Morrison.

119.    On February 27, 2015, MetLife filed an annual report on Form 10-K for the fiscal year ended December 31, 2014 (the "2014 Form 10-K") with the SEC, which provided the Company's annual financial results and position.  The 2014 Form 10-K was signed by Defendant Kandarian and Hele.  The 2014 Form 10-K contained signed SOX certifications by Defendant Kandarian and Hele attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

120.    The 2014 Form 10-K filed on February 27, 2015 reported that during the year ended December 31, 2014, MetLife repurchased 18,876,363 shares of common stock in the open market for $1.0 billion utilizing authorizations to repurchase MetLife stock granted in January 2008 and April 2008.  In 2015, through February 23, 2015, MetLife repurchased 15,081,322 shares of its

common stock in the open market for $739 million utilizing authorizations granted in April 2008

and December 2014 to repurchase MetLife stock.

121.   The 2014 10-K stated the following regarding the Company's controls and

procedures:

**Item 9A. Controls and Procedures**

Management, with the participation of the Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e) as of the end of the period covered by this report. Based on that evaluation, *the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective.*

There were no changes to the Company's internal control over financial reporting as defined in Exchange Act Rule 13a-15(f) during the quarter ended December 31, 2014 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Management's Annual Report on Internal Control Over Financial Reporting**
Management of MetLife, Inc. and subsidiaries is responsible for establishing and maintaining adequate internal control over financial reporting. In fulfilling this responsibility, estimates and judgments by management are required to assess the expected benefits and related costs of control procedures. The objectives of internal control include providing management with reasonable, but not absolute, assurance that assets are safeguarded against loss from unauthorized use or disposition, and that transactions are executed in accordance with management's authorization and recorded properly to permit the preparation of consolidated financial statements in conformity with GAAP.

Management has documented and evaluated the effectiveness of the internal control of the Company at December 31, 2014 pertaining to financial reporting in accordance with the criteria established in *Internal Control — Integrated Framework* (*2013*) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

*In the opinion of management, MetLife, Inc. maintained effective internal control over financial reporting at December 31, 2014*.   [Emphasis added].

122.   On March 23, 2015, MetLife filed its definitive proxy statement on Form DEF 14A

with the SEC (the "2015 Proxy").  The 2015 Proxy included proposals for the election of directors

and approval of compensation paid to MetLife's named executive officers.  The 2015 Proxy did

not disclose any issues or concerns with the effectiveness of MetLife's internal controls.  Instead, MetLife stated "[d]uring 2014, management updated its internal control documentation for changes in internal control and completed its testing and evaluation of MetLife's system of internal control over financial reporting in response to the requirements set forth in Section 404 of the Sarbanes-Oxley Act of 2002 and related regulation."  It confirmed that MetLife's Audit Committee reviewed the report of management's assessment of the effectiveness of internal control over financial reporting contained in the Company's 2014 Form 10-K.  In the 2015 Proxy, MetLife asked that each voting shareholder approve the MetLife directors up for election and further approve the executive compensation plan.  The Director Defendants who were nominees at this time were Grisé, Gutierrez, Hubbard, Kandarian, Kelly, Kennard, Kilts, Kinney, and Morrison.

123.    On February 25, 2016, MetLife filed an annual report on Form 10-K for the fiscal year ended December 31, 2015 (the "2015 Form 10-K") with the SEC, which provided the Company's annual financial results and position.  The 2015 Form 10-K was signed by Defendant Kandarian and Hele.  The 2015 Form 10-K contained signed SOX certifications by Defendant Kandarian and Hele attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

124.    The 2015 Form 10-K filed on February 25, 2016 reported that during the years ended December 31, 2015 and 2014, MetLife repurchased 39,491,991 and 18,876,363 shares of common stock in the open market for $1.9 billion and $1.0 billion, respectively.

125.    In 2016, through January 7, 2016, MetLife repurchased 1,445,864 shares of its common stock in the open market for $70 million pursuant to an authorization to repurchase stock granted in September 2015.

126.    The 2015 Form 10-K stated the following regarding the Company's controls and

procedures:

### Item 9A. Controls and Procedures

Management, with the participation of the Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e) as of the end of the period covered by this report. Based on that evaluation, *the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective.*

There were no changes to the Company's internal control over financial reporting as defined in Exchange Act Rule 13a-15(f) during the quarter ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

### Management's Annual Report on Internal Control Over Financial Reporting

Management of MetLife, Inc. and subsidiaries is responsible for establishing and maintaining adequate internal control over financial reporting. In fulfilling this responsibility, estimates and judgments by management are required to assess the expected benefits and related costs of control procedures. The objectives of internal control include providing management with reasonable, but not absolute, assurance that assets are safeguarded against loss from unauthorized use or disposition, and that transactions are executed in accordance with management's authorization and recorded properly to permit the preparation of consolidated financial statements in conformity with GAAP.

Management has documented and evaluated the effectiveness of the internal control of the Company at December 31, 2015 pertaining to financial reporting in accordance with the criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

*In the opinion of management, MetLife, Inc. maintained effective internal control over financial reporting at December 31, 2015*.  [Emphasis added].

127.    On April 26, 2016, MetLife filed its definitive proxy statement on Form DEF 14A

with the SEC (the "2016 Proxy").  The 2016 Proxy included proposals for the election of directors

and approval of compensation paid to MetLife's named executive officers.  The 2016 Proxy did

not disclose any issues or concerns with the effectiveness of MetLife's internal controls.  Instead,

MetLife stated: "[d]uring 2015, management updated its internal control documentation for changes in internal control and completed its testing and evaluation of MetLife's system of internal control over financial reporting in response to the requirements set forth in Section 404 of the Sarbanes-Oxley Act of 2002 and related regulation." It confirmed that MetLife's Audit Committee reviewed the report of management's assessment of the effectiveness of internal control over financial reporting contained in the Company's 2015 Form 10-K. In the 2016 Proxy, MetLife asked that each voting shareholder approve the MetLife directors up for election and further approve the executive compensation plan. The Director Defendants who were nominees at this time were Grisé, Gutierrez, Hubbard, Kandarian, Kelly, Kennard, Kilts, Kinney, and Morrison.

128.    On March 1, 2017, MetLife filed an annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-K") with the SEC, which provided the Company's annual financial results and position. The 2016 Form 10-K was signed by Defendant Kandarian and Hele. The 2016 Form 10-K contained signed SOX certifications by Defendant Kandarian and Hele attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

129.    The 2016 Form 10-K filed on March 1, 2017 reported that at December 31, 2016, MetLife had $2.7 billion in authority to repurchase its own common stock remaining under an authorization granted in November 2016.

130.    From January 2017 through February 23, 2017, MetLife repurchased 8,718,054 shares of its common stock in the open market for $468 million.

131.    The 2016 Form 10-K stated the following regarding the Company's controls and

procedures:

### Item 9A. Controls and Procedures

Management, with the participation of the Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e) as of the end of the period covered by this report. Based on that evaluation, *the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective.*

There were no changes to the Company's internal control over financial reporting as defined in Exchange Act Rule 13a-15(f) during the quarter ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

### Management's Annual Report on Internal Control Over Financial Reporting
Management of MetLife, Inc. and subsidiaries is responsible for establishing and maintaining adequate internal control over financial reporting. In fulfilling this responsibility, estimates and judgments by management are required to assess the expected benefits and related costs of control procedures. The objectives of internal control include providing management with reasonable, but not absolute, assurance that assets are safeguarded against loss from unauthorized use or disposition, and that transactions are executed in accordance with management's authorization and recorded properly to permit the preparation of consolidated financial statements in conformity with GAAP.

Management has documented and evaluated the effectiveness of the internal control of the Company at December 31, 2015 pertaining to financial reporting in accordance with the criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

*In the opinion of management, MetLife, Inc. maintained effective internal control over financial reporting at December 31, 2015.*  [Emphasis added].

132.    On April 27, 2017, MetLife filed its definitive proxy statement on Form DEF 14A

with the SEC (the "2017 Proxy").  The 2017 Proxy included proposals for the election of directors

and approval of compensation paid to MetLife's named executive officers.  The 2017 Proxy did

not disclose any issues or concerns with the effectiveness of MetLife's internal controls.  Instead,

MetLife stated: "[d]uring 2016, management updated its internal control documentation for changes in internal control and completed its testing and evaluation of MetLife's system of internal control over financial reporting in response to the requirements set forth in Section 404 of the Sarbanes-Oxley Act of 2002 and related regulation." It confirmed that MetLife's Audit Committee reviewed the report of management's assessment of the effectiveness of internal control over financial reporting contained in the Company's 2016 Form 10-K. In the 2017 Proxy, MetLife asked that each voting shareholder approve the MetLife directors up for election and further approve the executive compensation plan. The Director Defendants who were nominees at this time were Grisé, Gutierrez, Herzog, Hubbard, Kandarian, Kelly, Kennard, Kilts, Kinney, and Morrison.

133.    The statements referenced above were materially false and/or misleading because they misinterpreted and failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made and/or allowed the Company to make false and/or misleading statements and/or failed to disclose that: (i) MetLife's practices and procedures used to estimate its reserves set aside for annuity and pension payments were inadequate; (ii) MetLife had inadequate internal controls over financial reporting; and (iii) as a result, the statements by Defendants about MetLife's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

134.    The 2017 Form 10-K filed on March 1, 2018 reported that during the years ended December 31, 2017, 2016 and 2015, MetLife repurchased 56,599,540 shares, 6,948,739 shares and 39,491,991 shares under previously granted repurchase authorizations for $2.9 billion, $372 million, and $1.9 billion, respectively.

135.    From January 2018 through February 16, 2018, MetLife repurchased 7,499,116 shares of its common stock in the open market for $392 million.

136.    The 2018 Form 10-K filed on February 22, 2019 reported that during the years ended December 31, 2018, 2017 and 2016, MetLife repurchased 88,029,138 shares, 56,599,540 shares and 6,948,739 shares under previously granted repurchase authorizations for $4.0 billion, $2.9 billion, and $372 million, respectively.

137.    From January 2019 through February 14, 2019, MetLife repurchased 1,947,100 shares of its common stock in the open market for $85 million.

### Defendants Admitted that the Company's Financial Statements Violated GAAP and SEC Regulations and were Materially False and Misleading

138.    SEC Regulation S-X requires financial statements filed with the SEC to be GAAP compliant.  Financial disclosures that fail to comply with GAAP are presumed to be misleading and inaccurate, even if the footnotes or other disclosures may state otherwise.  *See* 17 C.F.R. §210.4-01(a)(1).  Regulation S-X imposes the same GAAP compliance requirements upon interim financial statements. 17 C.F.R. §210.10-01(a).

139.    In the January 29, 2018 press release, MetLife admitted its financial statements issued to investors during the Relevant Period were not GAAP compliant.  Specifically, MetLife acknowledged that the statements were erroneous with respect to the Company's adequacy of accounting reserves for its group annuity business practice that includes the pension risk transfer annuity products.

140.    Liabilities reported under GAAP are estimated based, in part, on the present value of estimated future benefits to be paid.  *See* Accounting Standards Codification ("ASC") No. 944, Financial Services—Insurance.  Therefore, to be GAAP compliant, a company must estimate and report its liabilities based on the amount of estimated claims and liabilities it will pay in the future

to policyholders and other beneficiaries.  MetLife's financial statements, by understating the present value of those estimated future claim payments, violated GAAP.

141.   As a result, MetLife has now amended the financial statements issued to investors during the 2017, 2016 and 2015 fiscal years to correct such financial misstatements.  Among other periods, MetLife determined that the misstatements concerning its group annuity accounting reserves has caused the Company's:

- net income for the year ended December 31, 2016, to be overstated by approximately 3%;

- net loss during the quarter ended September 30, 2017, to be understated by approximately 10%; and

- net income for the quarter ended June 30, 2016, to be overstated by approximately 5%.

142.   In addition, MetLife has admitted that the misstatements of its group annuity accounting reserves before 2015 (*i.e.*, 2013 and 2014 fiscal years within the Relevant Period) has caused the Company's net income to be overstated by approximately $200 million.

143.   MetLife's financial statements concerning "liabilities for future policy benefits" included the Company's accounting reserves for MetLife's pension risk transfer business.  During the Relevant Period, MetLife's annual and quarterly reports filed with the SEC characterized the Company's "liabilities for future policy benefits" as being "critical" accounting estimates.  These annual and quarterly reports also explained that the Company's liabilities for future policy benefits are established using actuarial estimates of the amount of future pension benefits MetLife is obligated to pay pension risk transfer annuitants.

144.   Given the "critical" nature of these accounting estimates, it was incumbent upon Defendants to ensure that its accounting reserves for pension risk transfer annuitants were accurately maintained.  In fact, in 2002, the SEC issued the Financial Reporting Release No. 60,

Cautionary Advice Regarding Disclosure About Critical Accounting Policies, urging public companies to pay "special attention" to their most critical accounting policies and cautioning managers of public companies to "bring particular focus to the evaluation of the critical accounting policies" and to make certain that they can "defend the quality and reasonableness of the most critical policies."

145.    Despite the foregoing SEC regulatory requirements, critical accounting estimates associated with the Company's accounting reserves for pension risk transfer annuitants were prepared with such lack of care that they were misstated by over $500 million.  Throughout the Relevant Period, MetLife was repeatedly caused to misrepresent, and Defendant Kandarian and Hele repeatedly falsely certified, that the Company's internal controls were operating effectively when, in fact, MetLife's most critical accounting estimates were operated with material weaknesses and ineffective controls, as Defendants have now admitted.

146.    GAAP, in the SEC's Staff Accounting Bulletin No. 99, Materiality ("SAB No. 99"), provides that materiality in the context of financial information not only includes a quantitative assessment of the magnitude of a misstatement, but also requires a qualitative assessment of the factual context in which the user of the false financial statements would view the financial information.

147.    In addition, SAB No. 99 provides that the "volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."

148.    Likewise, GAAP, as articulated in the SEC's Codification of Staff Accounting Bulletins Topic 1M ("CSAB Topic 1M"), provides that materiality in the context of a financial misstatement not only includes an assessment of the magnitude of the misstatement in percentage

terms, but also requires an assessment of the factual context in which the user of financial statements would view the financial misstatement (referred to in accounting and auditing literature as "quantitative" and "qualitative" factors).

149.    For example, CSAB Topic 1M notes that even quantitatively small financial misstatements may be material if management has intentionally made adjustments to various financial statement items in a manner inconsistent with GAAP.  Accordingly, CSAB Topic 1M cautions that SEC registrants "should not assume that even small intentional misstatements in financial statements" are immaterial.

150.    Here, Defendants self-servingly characterize the Company's financial misstatements relating to MetLife's pension risk transfer business as being "immaterial," but admit that MetLife's financial statements were materially misstated in quantitative terms for the fiscal quarters ended June 30, 2016 and September 30, 2017 (*i.e.*, those financial statements contained in MetLife's August 5, 2016, and November 6, 2017, Forms 10-Q).  Thus, MetLife has admitted that its financial statements for these two fiscal quarters were materially misstated.

151.    The remaining Relevant Period fiscal years and quarters are also material given numerous qualitative factors that demonstrate the materiality of these financial misstatements. Indeed, it is inconceivable that a reasonable investor would consider financial misstatements in excess of one-half billion dollars to be immaterial when making an investment decision, especially given, among other things: (i) the importance of pension risk transfers to MetLife's U.S. business; (ii) the importance of MetLife's ability to timely locate and pay annuitants in the aftermath of the Multi-State Investigation and the 2012 Settlement Agreement; (iii) the Company's need to implement the Pilot Program to address its failure to accurately locate annuitants; (iv) that, as a result of this illegal and improper practice, MetLife experienced its first material weakness in

internal control over financial reporting since SOX became effective in 2006; (v) that Defendant

Kandarian, Hele, and Lenna, were forced to depart the Company for overseeing this illegal and

improper practice and MetLife was exposed to significant liability in the Massachusetts Litigation

and the NYDFS Investigation; and (vi) the significant negative market reaction to the revelations

contained in the 12/15/2017 Form 8-K and the 1/29/2018 press release, which erased over $5

billion of MetLife's market capitalization.

152.    Moreover, financial improprieties resulting in financial misstatements of such

magnitude bear directly upon the integrity of MetLife's financial reporting and the risk premium

investors assigned to MetLife's common stock, particularly when such misstatements were

associated with improprieties related to the Company's most critical accounting estimates. The

financial misstatements challenged herein were undoubtedly material to MetLife's investors.

153.    Accordingly, the financial statements and related financial disclosures contained in

the following annual and quarterly reports that MetLife filed with the SEC during the Relevant

Period were materially false and misleading:

| Date | Type | Description |
|------|------|-------------|
| 02/27/13 | Form 10-K | Annual Report for FY 12 |
| 07/07/13 | Form 10-Q | Quarterly Report for 1Q13 |
| 08/07/13 | Form 10-Q | Quarterly Report for 2Q13 |
| 11/07/13 | Form 10-Q | Quarterly Report for 3Q13 |
| 02/27/14 | Form 10-K | Annual Report for FY 13 |
| 05/08/14 | Form 10-Q | Quarterly Report for 1Q14 |
| 08/08/14 | Form 10-Q | Quarterly Report for 2Q14 |
| 11/06/14 | Form 10-Q | Quarterly Report for 3Q14 |
| 02/27/15 | Form 10-K | Annual Report for FY 14 |
| 05/08/15 | Form 10-Q | Quarterly Report for 1Q15 |
| 08/06/15 | Form 10-Q | Quarterly Report for 2Q15 |
| 11/05/15 | Form 10-Q | Quarterly Report for 3Q15 |
| 02/25/16 | Form 10-K | Annual Report for FY 15 |
| 05/06/16 | Form 10-Q | Quarterly Report for 1Q16 |
| 08/05/16 | Form 10-Q | Quarterly Report for 2Q16 |
| 11/03/16 | Form 10-Q | Quarterly Report for 3Q16 |
| 03/01/17 | Form 10-K | Annual Report for FY 16 |

| Date | Type | Description |
|------|------|-------------|
| 05/05/17 | Form 10-Q | Quarterly Report for 1Q17 |
| 08/04/17 | Form 10-Q | Quarterly Report for 2Q17 |
| 11/06/17 | Form 10-Q | Quarterly Report for 3Q17 |

154.    The financial statements and related financial disclosures in the MetLife SEC filings listed above were materially false and misleading when made because they misrepresented, or failed to disclose: (i) that MetLife's financial statements were presented in violation of GAAP; (ii) that MetLife's financial statements were materially misstated and should not have been relied upon because the Company's practice for locating pension risk transfer annuitants during the Relevant Period was improper and illegal; and (iii) that MetLife's financial statements were unreliable and materially misstated because the Company's internal controls over financial reporting contained material weaknesses.

### Defendants' Accounting Reserves Statements Omitted Material Information

155.    In addition to admitting that MetLife's financial statements violated GAAP and that the Company had material weaknesses in internal control over financial reporting at all relevant times during the Relevant Period, Defendants also admitted that MetLife understated accounting reserves due to MetLife's improper practice for locating pension risk transfer annuitants. This violated GAAP, which requires financial adjustments to accounting reserves in the ordinary course to be corrected in financial statements on a prospective basis.

156.    Defendants did not do that during the Relevant Period.  Instead, MetLife made retroactive adjustments to its historical pension risk transfer accounting reserves, and then reissued the Company's previously issued financial statements, a process which, under GAAP, is only to be utilized when correcting mistakes and oversights or misunderstandings of facts existing at the time the financial statements were prepared.  Accordingly, MetLife's financial misstatements during the Relevant Period were not due to benign, incorrect judgments in calculating the

4840-6156-1262, v. 1

Company's pension risk transfer accounting reserve estimates. *See, e.g.*, ASC No. 250 Accounting Changes and Error Correction.

157.   MetLife is required by applicable accounting standards and legal requirements to maintain reserves sufficient to pay, among other annuitants, its pension risk transfer annuitants. Once MetLife incorrectly presumed that these annuitants were deceased, the Company released the related benefit amount from its accounting reserves, which Defendants have now admitted artificially inflated MetLife's historical profits by over $500 million.

158.   Notwithstanding the foregoing, MetLife, at all relevant times during the Relevant Period, was caused to falsely and misleadingly assure investors that it had maintained adequate accounting reserves to meet the Company's obligations, including those for pension risk transfer annuitants.

159.   Specifically, each annual report that MetLife filed with the SEC during the Relevant Period contained the following materially false and misleading statements as they pertained to the Company's accounting reserves:

Policyholder Liabilities

We establish, and carry as liabilities, actuarially determined amounts that are calculated to meet our policy obligations when a policy matures or is surrendered, an insured dies or becomes disabled or upon the occurrence of other covered events, or to provide for future annuity payments. ***Our liabilities for future policy benefits and claims are established based on estimates by actuaries of how much we will need to pay for future benefits and claims.*** For life insurance and annuity products, we calculate these liabilities based on assumptions and estimates, including estimated premiums to be received over the assumed life of the policy, the timing of the event covered by the insurance policy, the amount of benefits or claims to be paid and the investment returns on the investments we make with the premiums we receive. ***We establish liabilities for claims and benefits based on assumptions and estimates of losses and liabilities incurred.*** Amounts for actuarial liabilities are computed and reported in the consolidated financial statements in conformity with GAAP. For more details on policyholder liabilities see "Management's Discussion and Analysis of Financial Condition and Results of Operations – Summary of Critical Accounting Estimates – Liability for Future Policy Benefits" and

"Management's Discussion and Analysis of Financial Condition and Results of Operations – Policyholder Liabilities."

Pursuant to state insurance laws and country regulators, MetLife, Inc.'s insurance subsidiaries establish statutory reserves, reported as liabilities, to meet their obligations on their respective policies. *These statutory reserves are established in amounts sufficient to meet policy and contract obligations, when taken together with expected future premiums and interest at assumed rates.*

\* \* \*

Policy and Contract Reserve Adequacy Analysis

*Annually, our U.S. insurance subsidiaries are required to conduct an analysis of the adequacy of all statutory reserves.* In each case, a qualified actuary must submit an opinion which states that the statutory reserves make adequate provision, according to accepted actuarial standards of practice, for the anticipated cash flows required by the contractual obligations and related expenses of the U.S. insurance subsidiary. The adequacy of the statutory reserves is considered in light of the assets held by the insurer with respect to such reserves and related actuarial items including, but not limited to, the investment earnings on such assets, and the consideration anticipated to be received and retained under the related policies and contracts. The Company may increase reserves in order to submit an opinion without qualification. *Since inception of this requirement, our U.S. insurance subsidiaries which are required by their states of domicile to provide these opinions have provided such opinions without qualifications.*

160.    Although the quoted passage above came from MetLife's Form 10-K filing for fiscal year 2012, dated February 27, 2013, Defendant Kandarian made the same false statements about the Company's reserves in the following annual and quarterly SEC filings issued during the Relevant Period:

| Date | Type | Description |
|------|------|-------------|
| 02/27/13 | Form 10-K | Annual Report for FY 12 |
| 02/27/14 | Form 10-K | Annual Report for FY 13 |
| 02/27/15 | Form 10-K | Annual Report for FY 14 |
| 02/25/16 | Form 10-K | Annual Report for FY 15 |
| 03/01/17 | Form 10-K | Annual Report for FY 16 |

161.    By making statements concerning the topic of MetLife's accounting reserves, which included those reserves designed to ensure that sufficient funds existed to compensate

pension risk transfer annuitants, Defendants had a duty to be complete and truthful in such statements. Because Defendants failed to disclose that MetLife's accounting reserves were being illegally and improperly released due to the Company's practice of presuming that pension risk transfer annuitants were deceased without sufficient evidence to make that determination, and without cross-checking the SSA-DMF, as the Company did each month for other group annuitants, these statements omitted material information from MetLife's investors, thereby rendering each of these statements materially false and misleading.

162.   Defendants' failure to adequately disclose an accurate portrayal of the Company's reserve practices for pension risk transfer annuitants during the Relevant Period in the SEC filings referenced in the table above rendered these statements materially false and misleading.

### The Statements About the Company's Pension Risk Transfer Obligations Omitted Material Information

163.   During the Relevant Period, Defendants often spoke about the Company's obligation to locate and compensate annuitants as being a critical component of its pension risk transfer business. Specifically, Defendants repeatedly stated that "[t]he Company fully guarantees [pension risk transfer] benefit payments and is ultimately responsible for all [pension risk transfer] benefit payments."

164.   That statement was repeatedly disseminated by Defendants to investors in the following SEC filings made by MetLife during the Relevant Period:

| Date | Type | Description |
|------|------|-------------|
| 02/27/14 | Form 10-K | Annual Report for FY 13 |
| 02/27/15 | Form 10-K | Annual Report for FY 14 |
| 05/21/15 | Form 8-K | Segment Reporting Changes and Other Updates |
| 02/25/16 | Form 10-K | Annual Report for FY 15 |
| 11/18/16 | Form 8-K | Segment Reporting Changes and Other Updates |
| 03/01/17 | Form 10-K | Annual Report for FY 16 |

165.    By making statements concerning the topic of MetLife's responsibility for paying pension risk transfer annuitants, Defendants had a duty to be complete and truthful in those statements.  Because Defendants failed to disclose that MetLife's practice for locating pension risk transfer annuitants was illegal and improper and was causing the Company to not pay these annuitants, and the corresponding impact on the Company's financial performance, internal controls, and reserves that this illegal and improper practice was having at all relevant times during the Relevant Period, this statement omitted material information from MetLife's investors, thereby rendering each making of this statement materially false and misleading.

166.    Defendants' failure to adequately disclose an accurate portrayal of the Company's ability to fulfill its responsibility to pay pension risk transfer annuitants during the Relevant Period in the SEC filings referenced in the table above rendered this statement materially false and misleading.

167.    In addition, during a MetLife investor conference call on December 12, 2014, Wheeler responded to an analyst's question about MetLife's view of the pension risk transfer business at that time.  In providing his response, Wheeler made the following materially false and misleading statements, stating, in pertinent part, as follows:

**Jimmy Bhullar (J.P. Morgan Analyst)**: Good morning.  Had a question for Bill.  I think in your presentation you mentioned that for each $1 billion of pension closeout sales the earnings are equal to about $10 million. So relatively high ROE, and assuming that equity's like close to 5% or 6% of assets, implies high teens ROE on that business.  Does that make sense?

Related to that is when you have lost – you've done a few deals but obviously you've lost on a lot of the large deals that have been announced. So just wondering if you could talk in a little bit more detail on when you have lost deals in the pension closeout markets, has it been more because of pricing or is it capabilities or other things that have enabled some of your competitors to actually end up with a bigger market share over the past year or two years?

**Wheeler**: Jimmy, couple things.  So in terms of incremental sales and earnings contribution and the relative ROE of that contribution, I think your rule of thumb of 5% to 6% capital allocation for a new closeout is probably a little low. It's probably closer to 7% or 8%. Each deal is a little different. The asset mix is a little different.

Remember, there's a lot of – there's some equities in those closeout portfolios to deal with the long-term liability.  So the ROEs I think are still attractive. But they're not high teens, they're probably mid-teens, roughly. So that's sort of one.

In terms of how we feel about the market and the fact that even though we've had a lot of good success in terms of winning deals in, I would say, the mid-sized market, we have not been successful in the jumbo. One, there's not a lot of jumbo deals so it's a small group of data points.

I think the issue is is you see pricing -- I think pricing is the most important thing in terms of winning any closeout. I think capabilities matters. I think our capabilities in this market are as good as anyone's.

We have been in this market a long time and we have done a lot of deals over the years and *we have invested a significant amount of money in a new administrative platform*. Remember, we're going to be administering these cases for literally decades. *So you have to have the right kind of investment in technology to make sure that you can administer them effectively, gee, 15, 20 years from now*.

*So we've spent a lot of money in our new administrative platform to do that*. [Emphasis added].

168.    By making statements concerning the topics of: (i) MetLife's responsibility for administering payments to pension risk transfer annuitants; and (ii) investments that MetLife made to its administrative platform for this purpose, Wheeler had a duty to be complete and truthful in his statements.  Because Wheeler failed to disclose that MetLife's practice for locating pension risk transfer annuitants was illegal and improper—which Wheeler knew, or recklessly disregarded, as he was in charge of MetLife's U.S. business when: (i) the 2012 Settlement Agreement specifically excluded pension risk transfer annuitants but caused the Company to update its practices for locating other annuitants; and (ii) MetLife was receiving monthly reports from the SSA-DMF to determine that group annuitants were deceased so that payments to them could be

stopped, but ignored that those same reports did not contain the names of those pension risk transfer annuitants who were being improperly presumed as dead—and the corresponding impact on the Company's financial performance, internal controls, and reserves that this illegal and improper practice was having at all relevant times during the Relevant Period, these statements omitted material information from MetLife's investors, thereby rendering these statements materially false and misleading.

169.    Wheeler's failures to adequately disclose an accurate portrayal of the Company's ability to fulfill its responsibility to pay pension risk transfer annuitants during the Relevant Period in the statements above rendered these statements materially false and misleading.

170.    In addition, the statements made by Wheeler were materially false and misleading when made because MetLife had not invested in a new administrative platform for its pension risk transfer business.  Instead, as the Company admitted at the end of the Relevant Period, at all relevant times before and during the Relevant Period, the Company employed an improper practice for locating pension risk transfer annuitants that consisted of just two form letters and then, if no response was received, death was presumed.  No other steps were taken.  Accordingly, Wheeler's statements were materially false when made.

**Omissions Based on Violations of Item 303 of SEC Regulation S-K [17 C.F.R. § 229.303]**

171.    Pursuant to Item 303, and the SEC's related interpretive releases thereto, an issuer is required to disclose known trends, uncertainties or risks that have had, or are reasonably likely to have, a materially adverse impact on net sales or revenues or income from continuing operations. Such disclosure is required by an issuer in the management's discussion and analysis section of Forms 10-K and Forms 10-Q.

172.    In May 1989, the SEC issued an interpretive release on Item 303 (the "1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> * * *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

173.    Furthermore, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)    is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)    if management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

174.    Item 303 required the disclosure of known risks and uncertainties to MetLife presented by the Company's reliance on an illegal and improper practice for locating pension risk transfer annuitants.  The Company did not make such required disclosures in the Forms 10-K and Forms 10-Q filed during the Relevant Period.  The specific Forms 10-K and Forms 10-Q in which Defendants failed to comply with Item 303 are listed below:

| Date | Type | Description |
|---|---|---|
| 02/27/13 | Form 10-K | Annual Report for FY 12 |
| 07/07/13 | Form 10-Q | Quarterly Report for 1Q13 |

66

| Date | Type | Description |
|------|------|-------------|
| 08/07/13 | Form 10-Q | Quarterly Report for 2Q13 |
| 11/07/13 | Form 10-Q | Quarterly Report for 3Q13 |
| 02/27/14 | Form 10-K | Annual Report for FY 13 |
| 05/08/14 | Form 10-Q | Quarterly Report for 1Q14 |
| 08/08/14 | Form 10-Q | Quarterly Report for 2Q14 |
| 11/06/14 | Form 10-Q | Quarterly Report for 3Q14 |
| 02/27/15 | Form 10-K | Annual Report for FY 14 |
| 05/08/15 | Form 10-Q | Quarterly Report for 1Q15 |
| 08/06/15 | Form 10-Q | Quarterly Report for 2Q15 |
| 11/05/15 | Form 10-Q | Quarterly Report for 3Q15 |
| 02/25/16 | Form 10-K | Annual Report for FY 15 |
| 05/06/16 | Form 10-Q | Quarterly Report for 1Q16 |
| 08/05/16 | Form 10-Q | Quarterly Report for 2Q16 |
| 11/03/16 | Form 10-Q | Quarterly Report for 3Q16 |
| 03/01/17 | Form 10-K | Annual Report for FY 16 |
| 05/05/17 | Form 10-Q | Quarterly Report for 1Q17 |
| 08/04/17 | Form 10-Q | Quarterly Report for 2Q17 |
| 11/06/17 | Form 10-Q | Quarterly Report for 3Q17 |

175.    MetLife's SEC filings referenced above did not mention any risks or uncertainties to the Company's business associated with relying on an improper and illegal practice for locating pension risk transfer annuitants.

176.    As detailed herein, however, the Company's practice for locating pension risk transfer annuitants was known to be improper at all relevant times throughout the Company, because: (i) the Company acknowledged at the end of the Relevant Period that this practice was both improper and ongoing at all relevant times; (ii) the Internal Audit Report acknowledged that there were "control weaknesses" caused by this improper practice; and (iii) the Company's earnings benefitted from this practice throughout the Relevant Period, meaning Defendants knew that this improper and illegal practice was contributing to those earnings.   The use of this improper and illegal practice presented risks and uncertainties to MetLife's business and operations given the uncertain – yet materially adverse – impact on MetLife that this practice for pension risk transfer annuitants could – and did – have.

## **THE TRUTH BEGINS TO TUMBLE OUT**

177.   On December 15, 2017, the Company filed a Form 8-K with the SEC during aftermarket hours announcing that the Company has not been able to locate some of the Company's annuitant population and its plan to provide an update upon the filing of the Form 10-K for the year ending December 31, 2017, stating in relevant part:

> Further, MetLife has been in the retirement business for many decades. As practices have evolved, we are improving the process used to locate a small subset of our total group annuitant population of approximately 600,000 that have moved jobs, relocated, or otherwise can no longer be reached via the information provided for them. We currently believe the portion of the subset that is most impacted is less than 5% of our total group annuitant population and they tend to be smaller size cases with average benefits of less than $150 per month.

> We are making our process more robust to include a wider set of search techniques and better utilize available technology.  Taking these actions would result in strengthening reserves, which in the period recorded may be material to our results of operations and is not reflected in the outlook presented herein.  We do not have an estimate at this point but we plan to provide further disclosure on our fourth quarter earnings call and in our annual report on Form 10-K for the year ended December 31, 2017.

178.   The same day, *The Wall Street Journal* published the article, "MetLife Discloses Failure to Pay Thousands of Workers' Pensions" which discussed how MetLife failed to pay monthly pension benefits and how long this wrongdoing was occurring, stating in relevant part:

> MetLife Inc. said it had failed to pay monthly pension benefits to possibly tens of thousands of workers in accounts that it has on its books as part of its large retirement business.

> ***The New York insurer said it is seeking to find the retirees who are owed money and who generally have average benefits of less than $150 a month. It said it believes the group represents less than 5% of about 600,000 people who receive certain benefits from the firm.***

> The discovery of the overdue money and the process of locating the missing people to pay them would require strengthening reserves, MetLife said in a filing. The company also said the amount "may be material to our results of operations."

> The workers affected by Friday's disclosure were likely owed a defined amount of monthly income when MetLife took on responsibility for the pensions from their

employers, under a booming business known as pension risk transfer. MetLife didn't say in what years it had acquired these particular pension plans, how many different plans the people were involved in, and how many years of missing income was owed.

***Some Wall Street analysts assumed that the payments could be 10 or more years, overdue. At $150 a month for 30,000 people—5% of the 600,000—over 10 years, that could be up to $540 million.*** [Emphasis added].

179.  On December 18, 2017, *Pension & Investments* published an article entitled "MetLife discloses it failed to pay benefits to some retirees from annuity buyouts" that included an emailed statement from MetLife.  This article provides in part:

> MetLife said in an emailed statement on Monday that its prior process for locating retirees who fell into those categories was insufficient. The company declined to comment on the total amount and how far back the missed payments go.

> "While it is still difficult to track everyone down, we have not been as aggressive as we could have been," the company said in a statement.  "When we realized this was a significant issue, we launched an effort to do three things: figure out what happened, strengthen our processes so that we do a better job locating retirees, and promptly pay anyone we find — as we always do.  We are implementing enhanced techniques within MetLife's retirement and income solutions business to better locate and promptly pay any group annuitant who may be entitled to benefits."

> "We are deeply disappointed that we fell short of our own high standards. Our customers deserve better.  We are committed to making this right for our customers. We found the issue, we self-reported it and we are committed to doing better," the statement concluded.  The company said it is cooperating with regulators.

180.  This article also noted that Massachusetts and the chief of its securities division, had begun an investigation into MetLife not paying benefits to that population.

181.  On this news, shares of MetLife fell $0.62 per share or over 1.2% over the next two trading days to close at $50.79 per share on December 19, 2017, resulting in direct monetary loss to investors.

182.  According to the litigation commenced against MetLife by the Massachusetts Securities Division ("Massachusetts Litigation"), which was launched against MetLife in June 2018 by the Massachusetts Securities Division's Enforcement Section, the form letters used by

MetLife were potentially confusing to annuitants because they did not make clear the connection between MetLife and the annuitants' former employer.  In other words, annuitants were often unaware that their benefits were being paid by MetLife instead of by their former employer.  This was significant because pension risk transfer annuitants are generally not notified when their benefits are transferred from their former employer to an insurance company. Thus, many annuitants may not have even understood why MetLife was contacting them in the first instance. This confusion is something Defendants could have easily remedied during the Relevant Period. They chose not to do so.

183.    On June 25, 2018, MetLife was also sued by Galvin and the Massachusetts Securities Division's Enforcement Section in the Massachusetts Litigation for allegedly violating Mass. Gen. Laws ch. 110A, §101(2) ("Mass. Section 101"), which closely resembles SEC Rule 10b-5, but does not have an implied private right of action.

184.    Specifically, the Massachusetts Litigation challenged some of the same statements concerning internal controls and accounting reserves from MetLife's Form 10-Ks issued during the Relevant Period for violating Mass. Section 101.

185.    The Massachusetts Litigation sought, among other things, to impose an administrative fine on MetLife and to have MetLife censured.  In addition, the Massachusetts Litigation sought to require MetLife to locate all Massachusetts residents eligible for pension risk transfer benefits from MetLife, to notify such Massachusetts residents of the benefits they are owed, and to immediately pay these benefits to those Massachusetts residents, with interest. The Massachusetts Litigation did not purport to seek damages on behalf of MetLife's investors.

186.    In a press release issued in connection with the announcement of the Massachusetts Litigation on June 25, 2018, Galvin commented about the ease with which his office was able

to locate Massachusetts retirees whose pension benefits were improperly withheld by MetLife, stating, in pertinent part, as follows:

> ***The complaint filed by Galvin's office alleges that MetLife's public filings contained material misstatements about the company's finances resulting from the failure to adequately administer employer pension plans***. Under these pension plans, MetLife was responsible for reserving enough money to make payments to Massachusetts pensioners, whose average age was 72. Instead, some reserves were released and became assets which inflated MetLife's bottom line.
>
> The charges brought by Galvin's office are the result of an investigation opened by his Securities Division in December 2017, after MetLife announced that it had lost track of tens of thousands of pensioners to whom they owed payments. MetLife had acquired the pension obligations from the retirees' employers.
>
> "Once we were notified of these so-called missing pensioners, my first priority was to track down Massachusetts seniors who were owed back pension payments," Galvin said. "***My office was able to locate a majority of the missing Massachusetts residents within just a few weeks. In fact, approximately half of these seniors were still living at the same address MetLife had on file for them for the entire time MetLife failed to make payments to people they had so callously designated as 'presumed dead***.'"
>
> "The payments to individual retirees may seem small to MetLife, but for the retired nurses, salesmen, shipbuilders, grocery clerks, and other seniors affected who are living primarily on social security, these payments were significant," Galvin added.
>
> *       *       *
>
> "***MetLife has an obligation to provide truthful statements in its public filings. They did not,***" Galvin said. "***Shareholders and investors were denied the ability to rely on MetLife's public statements. My action today is based on the misleading statements as to MetLife's financial condition.***" [Emphasis added].

187.     The Massachusetts Litigation highlighted the harm that MetLife's Relevant Period failures to locate pension risk transfer annuitants had on retirees, discussing, for example, a Vietnam war veteran who retired from a shipyard in 1986 but did not begin receiving his benefits from MetLife until 2018.

4840-6156-1262, v. 1

188.    On December 19, 2018, the Massachusetts Securities Division publicly announced that it had entered into the MA Consent Order with MetLife on December 18, 2018, thereby concluding the Massachusetts Litigation.

189.    According to the MA Consent Order, MetLife violated Mass. Section 101 by utilizing an improper practice for locating pension risk transfer annuitants and releasing reserves for those annuitants after presuming they had died without having a reasonable basis for this determination.

190.    By entering into the MA Consent Order, MetLife was publicly censured by the Massachusetts Securities Division and ordered to pay a $1 million administrative fine—among the higher end of fines leveled by the Massachusetts Securities Division.

191.    In addition, the MA Consent Order requires MetLife to adopt many of the practices for locating missing annuitants that the Company was forced to adopt for other annuitants as part of the 2012 Settlement Agreement.  This further supports Defendants' knowledge, or reckless disregard, of why it was improper for MetLife to exclude pension risk transfer annuitants from the enhanced location practices required by the 2012 Settlement Agreement.

192.    Specifically, in order to ensure that MetLife locates missing pension risk transfer annuitants, the MA Consent Order requires MetLife to utilize certified mail, telephone calls, database searches for updated addresses, contacting employers for updated addresses, and contacting family members of the annuitant.  Among other things, the MA Consent Order provides, in pertinent part, as follows:

> I. [MetLife] has and will continue to take reasonable steps to locate the Massachusetts Annuitant Population eligible for benefits pursuant to [MetLife] group annuity contracts, process all past due amounts plus any interest owed, and effect all continuing payments. ***The following shall constitute reasonable steps***:

1. Up to three (3) letters will be mailed to the most current address on file. *The first mailing will be a certified letter*. The second and third letters will be sent by first class mail if [MetLife] does not receive a response to the first letter. If any of the letters are returned as undeliverable, a manual search for a more current address will be conducted. If an alternate address is found, a new certified letter will be mailed to the updated address and the letter count is reset. If no alternate address is found, the second and third letters will be mailed to the original address. *The manual search will be through Accurint or one of* [MetLife's] *data vendors to obtain a better address*;

2. If still not located, [MetLife] will make best efforts to make up to *three (3) outbound telephone calls* on different days of the week and at different times of the day where a telephone number is available;

3. If still not located and [MetLife] has client contact information, [MetLife] will make reasonable efforts to attempt to *reach the plan sponsor or company contact to request participant information*;

4. If still not located and contact information is available for a spouse or designated beneficiary, [MetLife] *will attempt to contact the spouse and/or designated beneficiary*; and

5. [MetLife] shall provide a certification within one-hundred twenty (120) days of this Order of the remaining Massachusetts Annuitant Population deemed unresponsive, including the identity of the annuitant and all steps taken to contact the annuitant.

\*      \*      \*

L. [MetLife] shall provide the Enforcement Section with any related additional information or documentation reasonably requested by the Enforcement Section for three-hundred sixty-five (365) days after this Order, such as documentation submitted by annuitants and documentation supporting [MetLife's] decision regarding the resolution process;

M. [MetLife] shall, by March 31, 2019, provide to the Enforcement Section a copy of the formalized written policies and procedures designed to establish and maintain contact with annuitants whose benefits have not commenced. These policies and procedures may be updated on a going forward basis as necessary. Failure to comply with or modify the policies and procedures referenced in this paragraph only shall not constitute a failure to comply with terms of this Order. [Emphasis added].

4840-6156-1262, v. 1

193.    Thereafter, the NYDFS Investigation concluded on January 28, 2019, with the issuance of the NYDFS Consent Order and the NYDFS Press Release. The NYDFS announced that MetLife had been fined $19.75 million and was responsible for paying $189 million in restitution, with $66 million still owed as of January 2019.

194.    The NYDFS Press Release explains the relevant portions of the NYDFS's findings, and the relief agreed to between the NYDFS and MetLife, as detailed in the NYDFS Consent Order.  Specifically, the NYDFS Press Release states, in pertinent part, as follows:

> Financial Services Superintendent Maria T. Vullo today announced that the Department of Financial Services (DFS) has entered into a consent order with MetLife Insurance Company, ***under which the insurer will pay a penalty of $19,750,000 for violations of New York Insurance Law stemming from a DFS examination which found that the insurer failed to properly locate and pay benefits to thousands of New York insureds and beneficiaries***. As part of the consent order, MetLife will also pay retroactive benefits to policyholders in New York State and elsewhere totaling more than $189 million. The insurer has already paid $123 million of the approximately $189 million to consumers whose group annuity benefits had been lost or delayed and will pay the remainder going forward.
>
> *    *    *
>
> In today's consent order, MetLife was cited for violations dating back to 1992 and extending to 2017, including:
>
> - ***Improperly released reserves for 13,712 group annuity certificates, resulting in a subsequent reserve increase of more than $500 million;***
>
> - ***Failure to adequately search for group annuity certificate holders to whom it owed pension benefits***;
>
> - ***Failure to perform a cross-check against the Social Security Death Master File for group annuitants where a Social Security number was missing or a number was invalid***;
>
> - Failure to take reasonable efforts to confirm the death of an insured and timely commence outreach to beneficiaries where it did not have specific information in its administrative systems;
>
> - Failure to research and timely commence outreach where certain variations

74

of an insured's information existed in its administrative systems;

- Failure to ensure that variable annuity replacement disclosure statements were accurate and compliant with the law; and

- Failure to present consumers with an accurate comparison of the fees and expenses between existing and proposed variable annuity contracts.

In addition to the fine and restitution, MetLife must take the following corrective measures:

- *Establish and maintain full statutory reserves for all group pension certificate holders;*

- Pay retroactive benefits with interest to already retired group certificate holders or their surviving beneficiaries; and

- *Send letters to all group annuity certificate holders no later than 5 years prior to the normal retirement date*, including a certified letter around the normal retirement date, *and letters at least every five years thereafter until the insurer pays benefits*, escheats benefits under the Abandoned Property Law, or definitively determines that it has no payment obligation.

*The consent order requires MetLife to retain a third-party servicer that specializes in locating beneficiaries* who are due pension benefits and have not been paid. The insurer will be responsible for paying all expenses incurred by the third-party servicer.

The order also mandates that MetLife provide DFS with four detailed remediation plans providing for remediation or restitution to policyholders or their beneficiaries. Under the plans, *the insurer will be required to undertake such activities as utilizing an enhanced death database which includes data from sources in addition to the Social Security Death Master File*. [Emphasis added].

195.    In sum, the NYDFS Consent Order, like the MA Consent Order, requires MetLife to conduct many of the same practices for locating missing pension risk transfer annuitants that the Company was forced to adopt for other annuitants as part of the 2012 Settlement Agreement. The NYDFS Consent Order also specifically faults the Company for improperly releasing reserves for pension risk transfer annuitants without taking sufficient steps to locate them.  Thus, the

NYDFS Consent Order and NYDFS Press Release further support Defendants' knowledge, or reckless disregard, of why it was inappropriate for MetLife to release reserves for pension risk transfer annuitants during the Relevant Period who were presumed dead after not responding to two form letters.

196.    Indeed, the NYDFS Consent Order explains that MetLife's conduct in failing to adequately search for and compensate pension risk transfer annuitants violated no fewer than five New York insurance laws and six New York insurance regulations, as follows:

> By reason of the foregoing, as reflected in the Department's Report on the Examination, [MetLife] violated:
>
> New York Insurance Law Sections 4228(f)(l)(A); 4217; 3240; 2601(a)(3); and 2601(a)(4); Insurance Regulation No. 60 (2nd Amendment), 11 NYCRR Section 5I.6(b)(3); Insurance Regulation No. 60 (3rd Amendment), 11 NYCRR Section 51.6(b)(4); Insurance Regulation No. 60 (2nd Amendment), 11 NYCRR Section 51.6(b)(4); Regulation No. 60 (2nd Amendment), 11 NYCRR Section 51.6(b)(7); Insurance Regulation No. 11, 11 NYCRR 92; and Insurance Regulation No. 151, 11 NYCRR 99.

197.    The NYDFS Consent Order covered a market conduct examination by the NYDFS into MetLife's practice for the period from January 1, 2009 through February 21, 2018.  The NYDFS's conclusions were based on, among other things, representations made to the NYDFS by MetLife and the NYDFS's own factual examination.

198.    According to the Company's Third Quarter 2018 Form 10-Q ("3Q 2018 Form 10-Q"), in addition to the NYDFS Investigation, the Company disclosed that the Division of Enforcement of the SEC is also investigating these matters, and that several additional unnamed regulators have made inquiries relating to these matters.

199.    The 3Q 2018 Form 10-Q also explained that the Company has still not completed remediating the material weaknesses in internal controls disclosed in the February 13, 2018 Form 8-K.  That these internal control deficiencies still require remediation many months after their

initial disclosure demonstrates the extent to which MetLife's improper practices had severely damaged the Company's control over financial reporting.

200.    Finally, the Company's recent disclosures reveal, among other things that:

- Defendants knew, or recklessly disregarded, that pension risk transfer annuitants were being searched for using an antiquated practice that was known to be inadequate in light of the 2012 Settlement Agreement;

- Defendants knew, or recklessly disregarded, that Katz's testimony meant the Company could have easily used the SSA-DMF to ensure that pension risk transfer annuitants were actually deceased, but MetLife chose not do so;

- the Company admitted to two material weaknesses in internal controls, which, by definition, create an environment in which securities fraud can readily occur;

- the Company took extreme measures after this improper practice was revealed, including cutting the pay of Mr. Hele and Defendant Kandarian and removing from employment Hele, Lenna and Defendant Kandarian. These steps show that MetLife believed fraudulent activity had taken place in connection with this practice;

- the Company was forced to enter into the MA Consent Order, thereby causing MetLife to pay a $1 million fine, receive a public censure, and agree to change MetLife's outreach practice for locating missing pension risk transfer annuitants to align with the enhanced practices agreed to by MetLife in the 2012 Settlement Agreement; and

- the Company was forced to enter into the NYDFS Consent Order, thereby causing MetLife to pay a $19.75 million fine and $189 million in restitution (with $66 million remaining outstanding), finding that MetLife violated several New York insurance laws and regulations and had improperly released reserves in connection with its practice for presuming pension risk transfer annuitants were dead after not responding to two form letters, and requiring MetLife to implement remedial measures similar to those detailed in the MA Consent Order and the 2012 Settlement Agreement.

201.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, the Company has suffered significant losses and damages.

## METLIFE DISCLOSES MATERIAL WEAKNESSES IN FINANCIAL REPORTING

202.   On January 29, 2018, MetLife issued a press release entitled, "MetLife Preannounces Preliminary Fourth Quarter 2017 Earnings, Reschedules Earnings Release and Conference Call" which announced that MetLife had to reschedule the earnings releases and conferences calls the fourth quarter 2017 and the full year 2017, that the Company identified material weaknesses in its internal controls, that the Company would have to make revisions to prior financial statements, and the SEC and New York Department of Financial Services made inquiries to the Company.  This press release stated:

NEW YORK -- (BUSINESS WIRE) -- Jan. 29, 2018 -- MetLife, Inc. (NYSE: MET) today announced it has postponed its earnings report and conference call related to its results for the fourth quarter and full year ended Dec. 31, 2017, which had previously been scheduled for Jan. 31, 2018, and Feb. 1, 2018, respectively. MetLife will now issue its fourth quarter and full year 2017 earnings report and its Fourth Quarter Financial Supplement on Tuesday, Feb. 13, 2018 after the market closes. The company will hold its earnings conference call and audio webcast on Wednesday, Feb. 14, 2018 from 8:00 to 9:00 a.m. (EST).  MetLife expects to file its 2017 Form 10-K by March 1, 2018.

On its Dec. 15, 2017, Investor Outlook Call, MetLife announced that it was undertaking a review of practices and procedures used to estimate its reserves related to certain Retirement and Income Solutions group annuitants who have been unresponsive or missing over time.

***Management of the company has determined the prior release of group annuity reserves resulted from a material weakness in internal control over financial reporting.*** MetLife expects to increase reserves in total between $525 million and $575 million pre-tax, to adjust for reserves previously released, as well as accrued interest and other related liabilities. The amount of the reserve increase is based in substantial part on actuarial, legal, statistical, and other assumptions. If actual facts and factors differ from those the company has assumed, the reserve the company has established could be adversely or positively affected.

The total amount expected to impact fourth quarter 2017 net income is between $135 million and $165 million pre-tax, the majority of which represents a current period strengthening of reserves and will be reflected in Adjusted Earnings (formerly known as Operating Earnings).  ***We expect the full year 2017 net income impact to be between $165 million and $195 million pre-tax. In addition, the company intends to make prior period revisions to reflect the balance of these***

*adjustments in the appropriate historical periods. The company also expects to correct historical periods for unrelated errors in those periods, as required by accounting standards. Those errors were previously recorded in the periods in which the company identified them.*

Revisions to prior periods will be included in MetLife's 2017 Form 10-K and Fourth Quarter Financial Supplement. These revisions will not constitute a restatement of previously issued financial statements. These pre-tax revisions will be taxed at the 35% U.S. tax rate in effect, and the impacts of the recently enacted U.S. tax reform legislation will be reflected in Corporate & Other in the fourth quarter of 2017.

In connection with MetLife's review and enhancement of the processes and procedures relating to its Retirement and Income Solutions business in the United States, MetLife is currently reviewing its processes and procedures for identifying unresponsive and missing international group annuity annuitants and pension beneficiaries. In addition, MetLife recently initiated an ongoing global review of its processes and procedures for identifying unresponsive and missing policyholders and beneficiaries for the other insurance and annuity products it offers. MetLife is not currently aware of any material deficiencies in its identification of unresponsive or missing annuitants, policyholders or beneficiaries with respect to such products under review.

*MetLife had previously informed its primary state regulator, the New York Department of Financial Services, about this matter and is responding to questions from them and other state regulators. The U.S. Securities and Exchange Commission enforcement staff has also made an inquiry regarding this matter and MetLife is responding to its questions.* To date, MetLife is not aware of any intentional wrongdoing in connection with this matter. [Emphasis added].

203.    On this news, shares of MetLife fell $6.28 per share or over 11.6% over the next two trading days to close at $48.07 per share on January 31, 2018.

204.    On February 13, 2018, MetLife filed a Form 8-K with the SEC, which also attached a press release, a quarterly financial supplement for the quarter ended December 31, 2017, and a slide presentation. This Form 8-K reported that MetLife had *two* material weaknesses in internal controls that were caused by the Company's improper practice for locating pension risk transfer annuitants, stating, in relevant part:

On December 15, 2017, MetLife, Inc. (together with its subsidiaries, the "Company") announced that it was undertaking a review of practices and procedures used to estimate its reserves related to certain Retirement and Income Solutions ("RIS") group annuitants who have been unresponsive or missing over time. As a result of this process, management, in consultation with the Audit Committee of MetLife, Inc.'s Board of Directors, has identified a material weakness in the Company's internal control over financial reporting related to certain RIS group annuity reserves.

*   *   *

Based on the Company's internal review, MetLife, Inc.'s Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") determined that there were deficiencies in the design and/or execution of internal controls that aggregated to a material weakness. Management determined that a lack of adequate controls over the administrative and accounting practices relating to certain RIS group annuity reserves and the untimely communication and escalation of issues regarding those reserves throughout the Company contributed to the material weakness.

In conjunction with the material weakness, the Company increased reserves by $510 million pre-tax to reinstate reserves previously released, and to reflect accrued interest and other related liabilities. Of the increase of $510 million, $372 million was considered an error and will be recorded as a revision to prior years presented in MetLife, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 10-K") and Quarterly Financial Supplement for the quarter ended December 31, 2017.

*   *   *

**Management's Annual Report on Internal Control Over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Exchange Act Rule 13a-15(f). In fulfilling this responsibility, estimates and judgments by management are required to assess the expected benefits and related costs of control procedures. The objectives of internal control include providing management with reasonable, but not absolute, assurance that assets are safeguarded against loss from unauthorized use or disposition, and that transactions are executed in accordance with management's authorization and recorded properly to permit the preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP").

Management evaluated the design and operating effectiveness of the Company's internal control over financial reporting based on the criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("the COSO framework"). Solely

because of the material weakness in internal control over financial reporting described below, in the opinion of management, MetLife, Inc. has not maintained effective internal control over financial reporting at December 31, 2017.

A material weakness (as defined in Rule 12b-2 under the Exchange Act) is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

**Identification of the Material Weakness in Internal Controls over Financial Reporting**

Approximately 25 years ago, companies that are or have been MetLife, Inc. subsidiaries established a practice of releasing the full insurance liability after two attempts at contacting these annuitants, based on the presumption that these annuitants would never respond and had not become entitled to benefits based on certain contractual provisions. The number of impacted annuitants for whom the Company released the full insurance liability was no more than 1,000 in any one year, and over the entire period totaled approximately 13,500 as of December 31, 2017, which is approximately 2% of the total group annuitant population.

Following a detailed review, management concluded that such administrative practices were not sufficient to allow for reserves to be released. In addition, management concluded that the reserve release process issues, to the extent identified earlier, were not timely communicated or escalated throughout the Company, hindering the Company's ability to fully identify and address these issues in a timely manner.

Management concluded its internal control over financial reporting as of December 31, 2017 was not effective based on the criteria established in the COSO framework. The Company has identified the following deficiencies in the principles associated with both the control activities and information and communication components of the COSO framework:

- Ineffective design and operating effectiveness of the controls related to processes and procedures for identifying unresponsive and missing group annuity annuitants and pension beneficiaries (Control Activities); and

- Ineffective design and operating effectiveness of the controls intended to ensure timely communication and escalation of the issue throughout the Company. (Information & Communication).

205.    The February 13, 2018 Form 8-K included a status from MetLife of its material

weakness remediation, and states in relevant part:

**Status of the Material Weakness Remediation**

The following remediation activities highlight the Company's commitment to
remediating its identified material weakness:

- Control Activities — The Company is making immediate changes to its
  administrative and accounting procedures and search practices to identify,
  contact, and record responses from "unresponsive and missing" plan
  annuitants and to otherwise locate missing annuitants. These procedures,
  which management will continue to refine, include, but are not limited to:

  o    Earlier, and more frequent, attempts to contact all annuitants prior to
       their normal retirement date ("NRD"), including the use of certified
       mail and additional external database searches;

  o    Revisions to communications to annuitants regarding their benefits,
       the consequences of failing to respond to the communications, and
       confirmation and use of current mailing addresses, email addresses
       and telephone numbers;

  o    Simplification and clarity of language in notification letters sent to
       annuitants;

  o    Additional data checks using additional commercial locator services
       90 days before NRD and when receiving returned mail; and

  o    Contacting the original plan sponsor (if available), as well as any
       contingent annuitant or beneficiary on file.

- Information and Communication—The Company is reviewing its practices
  regarding timely communication, escalation, and knowledge sharing
  throughout the Company.

206.    On or about February 14, 2018, MetLife hosted an investor conference call.  During

this call, Defendant Kandarian discussed MetLife's RIS business and the disclosed material

weaknesses stating in relevant part:

Most of my comment this morning will focus on the issue within our Retirement
and Income Solutions business that caused us to delay earnings and take an after-
tax charge of $331 million or $510 million pretax.

*Simply put, this is not our finest hour*. *We had an operational failure that never should have happened and it is deeply embarrassing*. We are undertaking a thorough review of our practices, processes and people to understand where we fell short and how we can reset the bar at the high level people have come to expect from us over our 150-year history. The Board of Directors is fully engaged on this issue as well.

\*      \*      \*

Recently, the Department of Labor has been urging companies that sponsor pension plans to do a better job of finding their own unresponsive and missing participants. *A pilot program MetLife conducted in 2016 and 2017 confirmed that with better outreach, we could establish contact with more people*. In the 1990s, MetLife established a practice of releasing reserves when the company could not establish contact with an annuitant. In retrospect, based in the process we had in place, this was an error.

\*      \*      \*

As we noted publicly in December, we launched an assessment into what happened. Well, I can report that to date, MetLife has not found any evidence of intentional wrongdoing. I can also tell you that *we are taking action to hold people accountable*. In addition, *we have taken steps to strengthen our processes for finding unresponsive and missing annuitants. These include additional mailings, certified mailings, phone calls and the use of additional third-party firms specializing in locating missing participants*.

\*      \*      \*

MetLife's core purpose is providing financial protection to our customers. Central to that purpose is the timely payment of benefits, which makes this issue especially distressing to me. I am deeply disappointed that we fell short of our own high standards. Our customers deserve our best efforts to find and pay them. We will do better. While I wish this issue had been escalated earlier for remediation, MetLife discovered the issue itself, self-reported it to our primary regulator, publicly disclosed it and is taking all necessary steps to fix it.

I will now discuss some of the ramifications of the group annuity issue. As mentioned, we took a charge to restore reserves previously release as well as accrued interest. Most of the charge is associated with periods prior to 2017. Given the size and nature of the issue, management has identified a material weakness in internal control of our financial reporting. This deficiency is only related to group annuity reserves.

> *The material weakness we identified had 2 components. First, we had a lack of adequate controls* over the administrative and accounting practices that led to the release of the reserves. *Historically, MetLife would try to reach annuitants twice, once when they approach the normal retirement age of 65 and a second time when they approach required minimum distribution age of 70.5. As noted, we improperly released reserves for those annuitants who were unresponsive after the second attempt.*

> *The second component was failure to escalate sooner.* The reserve release process issues were not communicated or escalated on a timely basis throughout MetLife, which hindered our ability to identify and address them. We are working hard to remediate the material weakness and expect to make progress in 2018. John Hele will discuss the material weakness further.

> \*        \*        \*

> We are also cooperating with our regulators on this matter, including the New York Department of Financial Services as our primary insurance regulator as well as the Securities and Exchange Commission as our securities regulator.    [Emphasis added].

207.    Regarding Defendant Kandarian's representation that MetLife was ". . . taking action to hold people accountable", starting on or about February 26, 2018 it was widely reported that Lenna, MetLife's Executive Vice President of RIS was "retiring" effective March 1, 2018. Additionally, in MetLife's 2018 Proxy it disclosed that "MetLife's Compensation Committee ensured continued alignment between performance and pay by: . . . reducing the CEO's [Kandarian] annual incentive award for 2017 by $1 million (25%) from 2016 while modestly increasing LTI [Long Term Incentives] from prior grant to reinforce alignment with shareholders; decreasing the CFO's [Hele] annual incentive award for 2017 by 25% from 2016 and also decreasing LTI from prior grant . . . ."  The 2018 Proxy further stated:

> Mr. Hele's AVIP [Annual Variable Incentive Plan] for 2017 performance and LTI granted in 2018 are less than for 2016 in consideration of the Company's performance in managing financial matters, including material weaknesses in internal control over financial reporting.

> \*        \*        \*

84

The Committee approved an AVIP award for Mr. Kandarian for 2017 that was down 25% from 2016 (*a decrease of $1,000,000*), reflecting the Committee's review of Mr. Kandarian's 2017 contributions to the Company's achievements in financial performance and progress on strategic objectives, and also the Company's operational challenges and trailing relative shareholder returns. Mr. Kandarian's compensation for 2017 performance was balanced with an increase in LTI granted in 2018, to recognize progress toward long-term strategic objectives and confidence in Mr. Kandarian's ability to achieve them.

*       *       *

Mr. Kandarian recommended, and the Committee approved, an AVIP award for 2017 that was down 25% from 2016 (*decrease of $500,000*). [Emphasis added].

208.    In the 2018 Proxy, MetLife provided no clarification regarding its listed inconsistent AVIP decreased amount paid to Kandarian ($1,000,000 vs. $500,000).

209.    Defendant Kandarian's promise during the 2/14/2018 Conference Call to hold executives "accountable" was quickly fulfilled.  On February 26, 2018, *The Wall Street Journal* reported that Lenna, who headed the Company's RIS business at all relevant times during the Relevant Period, was "retiring" effective March 1, 2018.  The article further noted that although the RIS business at MetLife was one of the Company's biggest contributors to profits in recent years, at more than $1 billion in 2017 on a pre-tax basis, the Company had no immediate successor for Lenna.

210.    The market viewed Lenna's departure not as a "retirement," but as fallout from MetLife's improper practice for locating pension risk transfer annuitants.  For example, according to a *Bloomberg* article dated February 26, 2018, entitled "MetLife Retirement Unit Head Lenna Leaving After Pension Mishap," Lenna's departure was linked to the Company's revelation that "it had lost track of some clients eligible to receive pensions."

211.    But MetLife was not done yet.  On April 26, 2018, the Company announced that it was cutting the pay of both Hele and Defendant Kandarian as a result of the material weaknesses

85

in internal controls caused by the Company's improper practice for locating pension risk transfer annuitants.   Specifically, Defendant Kandarian's compensation was cut 3.9%, down to $14.7 million, while Hele's compensation was cut 6.4%, down to $5.3 million.  Both Hele and Defendant Kandarian received a 25% reduction in the cash portion of their incentive pay that accounted for the cuts to their overall compensation.

212.    In cutting the pay of Hele and Defendant Kandarian, MetLife explained in an April 26, 2018 SEC filing on Form DEF 14A that it was due to the Company's first material weakness in internal control since SOX became effective, stating, in pertinent part, as follows:

213.    Mr. Hele's AVIP for 2017 performance and LTI granted in 2018 are less than for 2016 in consideration of the Company's performance in managing financial matters, including material weaknesses in internal control over financial reporting.

\*       \*       \*

> ***Mr. Kandarian recommended, and the Committee approved, an AVIP award for 2017 that was down 25% from 2016 (decrease of $500,000). Mr. Hele's LTI granted in 2018 is also lower than for the past two years. In each case, these awards reflect the Company's performance in managing financial matters, including material weaknesses in internal control over financial reporting.***  [Emphasis added].

214.    Just days later, on May 1, 2018, MetLife announced that Hele was "retiring" as the Company's CFO effective immediately, despite being only 59 years old.

215.    The market did not buy the Company's attempt to sanitize the true reason for Hele's departure. According to *Crain's New York Business*, "[Hele] gets [the] heave-ho amid ongoing accounting woes."  In addition, according to *The Financial Times*, "[Hele] leaves after reserves debacle," and further commenting that his "departure comes after the insurer acknowledged that

over a period of about 25 years, it failed to make hundreds of millions of dollars of pension payments to about 13,500 people."

216.    Likewise, Barclays analyst Jay Gelb wrote in a May 1, 2018, report on MetLife, in pertinent part, that "We were not expecting this transition in the CFO role, although our sense was there has been investor frustration following various charges related to . . . pension risk transfer issues."

217.    Also, on April 26, 2018, Defendant Kandarian issued his annual Chairman's letter to MetLife's shareholders and admitted that the problems with MetLife's improper practice for locating pension risk transfer annuitants was one of the three biggest problems facing MetLife since 2011, stating, in pertinent part, as follows:

> Over the past seven years, MetLife has faced three main challenges it needed to overcome to create value for shareholders.
>
> *        *        *
>
> Our third – and current – challenge is operational. ***The issue in our group annuity business was an operational failure that never should have happened***. Nor was it the first negative surprise in recent years. Some of the company's challenges have their roots in business written decades ago, ***but others occurred on the watch of this management team***. Strengthening the company's ability to execute is critical if we are going to deliver better returns to shareholders. The Board of Directors shares this view and is actively involved in overseeing management's actions to improve operational performance. [emphasis added].

218.    Defendant Kandarian was not spared from the Company's efforts to hold "accountable" the individuals responsible for the pension risk transfer failures at MetLife. On January 8, 2019, the Company announced that Defendant Kandarian was to be replaced as CEO and Chairman of the Board, effective April 30, 2019.

219.    As with Hele's departure, the market disagreed with the Company's attempt to label Defendant Kandarian's departure as a "retirement."  According to *Crain's New York Business*, in an article entitled "MetLife names Khalaf chief executive after 19% stock slump":

> MetLife Inc. named Michel Khalaf to succeed Steven Kandarian as chief executive officer as the company looks to rebound from missteps that pushed the shares lower last year. A top priority for Khalaf, 54, will be bolstering investor confidence in the insurer, which disclosed in 2017 that it failed to pay thousands of people owed pension payments. That sparked regulatory investigations as MetLife revealed material weaknesses in internal controls and issued a public mea culpa. The shares tumbled 19% last year.

220.    Articles from *The Wall Street Journal* and *Bloomberg* similarly discussed the Company's failure to adequately search for and compensate pension risk transfer annuitants in describing Defendant Kandarian's departure.

221.    On May 7, 2018, MetLife filed a Form 8-K with the SEC and attaching its May 1, 2018 press release announcing the "retirement" of Hele as MetLife's Executive Vice President and Chief Financial Officer.  The Form 8-K and press release only referred to Hele as "retiring", and in the press release Defendant Kandarian thanked Hele for his service.  In fact, a review of the MetLife/Hele May 12, 2018 Separation Agreement demonstrates that MetLife is required to refer to Hele's departure only as a "retirement", stating in relevant part:

222.    MetLife agrees to instruct its Executive Group, direct reports to its CEO and direct reports to its Chief Financial Officer (i) to continue to refer to Mr. Hele's departure from MetLife as a retirement; and (ii) not to make any personally or professionally disparaging or demeaning remarks about Mr. Hele […]

223.    Notwithstanding MetLife's earlier representation that "we are taking action to hold people accountable," the MetLife/Hele May 12, 2018 Separation Agreement evidences the opposite.  Through this Separation Agreement, Hele continued his employment with MetLife

through a defined transition period as a "Special Actuarial Advisor to the Chief Executive Officer." Hele continued to receive his previous base salary and enjoy the same employee benefits. This Separation Agreement also provides for **an additional payment to Hele of up to $1.5 million** payable not later than March 15, 2019. Further, Hele's rights under any MetLife Stock and Incentive Compensation Plan and Equity Awards are generally not affected by this Separation Agreement, except that the term of Hele's employment shall include this additional transition time.

### IN REPURCHASING STOCK, METLIFE RELIED ON FALSE OR MISLEADING STATEMENTS MADE BY DEFENDANT KANDARIAN AND WHEELER

224. In repurchasing common stock, MetLife relied on false or misleading statements made by Defendant Kandarian and Wheeler either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

225. Throughout the Relevant Period, MetLife justifiably expected Defendant Kandarian and Wheeler to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC and in statements made to the investing public. MetLife would not have purchased its securities at artificially inflated prices had Defendant Kandarian and Wheeler disclosed all material information known to them or that was so obvious it should have been known to them, as detailed herein. Thus, reliance by MetLife should be presumed with respect to Defendant Kandarian's and Wheeler's omissions of material information as established by the *Affiliated Ute* presumption of reliance.

226. Additionally, the "fraud on the market" presumption applies to Defendant Kandarian's and Wheeler's  misstatements of material facts or failures to disclose material facts.

227.    At all relevant times, the market for MetLife stock was efficient market for the following reasons, among others:

(a)    MetLife stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, MetLife filed periodic public reports with the SEC and NYSE;

(c)    MetLife's common-stock trading value was substantial on a daily basis, exceeding millions of shares per day throughout the Relevant Period;

(d)    MetLife regularly and publicly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    MetLife was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace; and

(f)    The market price of MetLife's stock reacted rapidly to new information entering the market.

228.    As a result of the foregoing, the market for MetLife stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of MetLife's common stock.  The foregoing facts indicate the existence

of an efficient market for trading of MetLife's stock and support application of the fraud-on-the-market doctrine.

229.    MetLife relied on the integrity of the market price for the repurchase of its common stock and is entitled to a presumption of reliance with respect to the misstatements and omissions by Defendant Kandarian and Wheeler alleged herein.

230.    Had MetLife known of the material adverse information not disclosed by Defendant Kandarian and Wheeler, or been aware of the truth behind the material misstatements by Defendant Kandarian and Wheeler, the Company would not have purchased MetLife stock at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

231.    As a result of the Company's purchases of MetLife common stock during the Relevant Period, the Company suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused the Company's common stock to trade at artificially inflated levels throughout the Relevant Period, reaching as high as $55.73 per share on November 2, 2017.

232.    On December 15, 2017, after the close of the trading day, Defendants caused MetLife to issue the 12/15/2017 Form 8-K and announced, among other things, that the Company could be required to materially increase its reserves because it had failed to compensate approximately 30,000 pension risk transfer annuitants before and during the Relevant Period.

233.    In response to the aftermarket revelations on December 15, 2017, the trading price of MetLife's common stock declined from a close of $51.41 on Friday, December 15, to a close of $50.79 on Tuesday, December 18—a sharp decline of $0.62, or 1.2%.  This decline eradicated approximately $528 million of MetLife's market capitalization.  The trading volume was unusually

high, with trading volume of approximately 16 million shares traded, more than 2.5 times the average daily trading volume over the preceding year.

234.    Then, after the close of the trading day on January 29, 2018, Defendants caused MetLife to issue the 1/29/2018 press release and announced, among other things, that the Company's improper and illegal Relevant Period practice for locating pension risk transfer annuitants had caused a material weakness in internal control.  The identified internal control weakness required the Company to increase its reserves by between $525 million and $575 million, and drew scrutiny from numerous regulators, including the SEC and NYDFS.

235.    In response to the aftermarket revelations on January 29, 2018, the trading price of MetLife's common stock declined from a close of $54.40 on January 29, to a close of $48.07 on January 31—a further plummeting of $6.33, or 11.6%.  This time, the drop eradicated approximately $5.1 billion of MetLife's market capitalization.  The trading volume was unusually high, with trading volume of approximately 30 million shares traded, more than 4.5 times the average daily trading volume over the preceding year.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

236.    Plaintiff brings this action derivatively in the right and for the benefit of MetLife to redress injuries suffered and to be suffered as a direct and proximate result of Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act, Rule 10b-5, and their breaches of fiduciary duties and other wrongful conduct as alleged herein occurred during the Relevant Period.

237.    Plaintiff will adequately and fairly represent the interests of MetLife in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

238.    Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock since the date on which the Company became a stock company.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

239.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board of MetLife to institute this action against the Director Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

240.    At the time this suit was filed, the MetLife Board was comprised of twelve (12) members - Kandarian, Grisé, Gutierrez, Hassell, Herzog, Hubbard, Kelly, Kennard, Kilts, Kinney, McKenzie and Morrison.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, six (6), could not exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

241.    The Director Defendants face a substantial likelihood of liability in this action because they caused MetLife to issue false and misleading statements concerning the information described herein.  Because of their advisory, executive, managerial, and directorial positions with MetLife, the Director Defendants had knowledge of material non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

242.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

243.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously

prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff did not make (and was excused from making) a pre-filing demand on the Board to initiate this action because making a demand would have been a futile and useless act.

244.   Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

245.   Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

246.   Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## THE DIRECTOR DEFENDANTS WERE NOT INDEPENDENT

### Defendant Kandarian

247.   Defendant Kandarian was the CEO and president of MetLife.  Defendant Kandarian was also a Director of the Company and held this position beginning in 2012.  Defendant Kandarian was not disinterested or independent, and therefore, was incapable of considering demand because Kandarian (as CEO and president) was an employee of the Company who derived substantially all of his income from his employment with MetLife, making him not independent. In fact, since 2012, MetLife paid Kandarian almost $100 million as its president and CEO.  As

such, Kandarian could not independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would have exposed him to liability and threaten his livelihood.  Additionally, MetLife admitted that Kandarian was not independent in its 2018 Proxy and in other public filings.

248.    This lack of independence and financial benefits received by Defendant Kandarian rendered him incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Long Standing Director Defendants Grisé, Kilts,**
**Hubbard, Kinney, Kandarian, Gutierrez, and Kennard**

249.    Grisé joined the MetLife Board of Directors in 2004.  Since 2012, MetLife has paid Grisé more than $1.8 million.

250.    Kilts joined the MetLife Board of Directors in 2005.  Since 2012, MetLife has paid Kilts more than $1.6 million.

251.    Hubbard joined the MetLife Board of Directors in 2007.  Since 2012, MetLife has paid Hubbard more than $1.6 million.

252.    Kinney joined the MetLife Board of Directors in 2009.  Since 2012, MetLife has paid Grisé more than $1.5 million.

253.    Kandarian joined MetLife in 2005 as an executive officer and joined its Board of Directors in 2012.  Since 2012, MetLife has paid Kandarian more than $99 million.

254.    Gutierrez joined the MetLife Board of Directors in 2013.  Since 2013, MetLife has paid Gutierrez more than $1.2 million.

255.    Kennard joined the MetLife Board of Directors in 2013.  Since 2013, MetLife has paid Kennard more than $1.1 million.

256.    Each of these long-standing directors (except Gutierrez and Kennard) were

4840-6156-1262, v. 1

members of MetLife's Board during the Multi-State Investigation and the 2012 Settlement Agreement discussed herein. As such, each of these defendants knew or recklessly disregarded the issues, findings and results of this investigation and settlement, which directly relates to the wrongful conduct now alleged and admitted by MetLife.

257.   Gutierrez and Kennard, though not members of the Board at the time of the Multi-State Investigation and the 2012 Settlement Agreement, knew of this Multi-State Investigation and the 2012 Settlement Agreement or should have known and/or recklessly disregarded these matters.

258.   Based on this prior knowledge and experience which directly relates to the issues and allegations of wrongdoing alleged herein, Grisé, Kilts, Hubbard, Kinney, Kandarian, Gutierrez, and Kennard failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Therefore, Defendants Grisé, Kilts, Hubbard, Kinney, Kandarian, Gutierrez, and Kennard face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Audit Committee – Defendants Grisé, Hassell, Herzog, Kelly, Kinney, and McKenzie**

259.   Grisé has been a member of the Audit Committee from at least 2011 to the present.

260.   Hassell has been a member of the Audit Committee since 2018.

261.   Herzog has been the Chairman and a member of the Audit Committee from 2017 to the present.

262.   Kelly been a member of the Audit Committee from 2015 to the present.

263.   Kinney has been a member of the Audit Committee from at least 2011 to the present.

264.   McKenzie has been a member of the Audit Committee since 2018.

265.   Pursuant to the Company's Audit Committee Charter, the members of the Audit

Committee are responsible for, *inter alia*, reviewing Management's Discussion and Analysis, press releases, and assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

266.    Defendants Grisé, Hassell, Herzog, Kelly, Kinney, and McKenzie, and during the times each served on this committee, breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, permitted the use of inadequate practices and procedures to estimate its reserves set aside for annuity and pension payments, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  Therefore, Defendants Grisé, Hassell, Herzog, Kelly, Kinney, and McKenzie face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Finance and Risk Committee – Defendants Hassell,**
**Herzog, Hubbard, Kelly, Kennard, and Kinney**

267.    Hassell has been a member of the Finance and Risk Committee since 2018.

268.    Herzog has been a member of the Finance and Risk Committee from 2017 to the present.

269.    Hubbard has been a member of the Finance and Risk Committee from at least 2011 to the present.

270.    Kelly has been a member of the Finance and Risk Committee from 2015 to the present, and Chairman of this committee in 2018.

271.    Kennard has been a member of the Finance and Risk Committee from 2015 to the present.

4840-6156-1262, v. 1

272.     Kinney has been a member of the Finance and Risk Committee from at least 2011 to the present.

273.     The Finance and Risk Committee is responsible for, among other matters, assessment and management of material risks.  Based thereon, the Hassell, Herzog, Hubbard, Kelly, Kennard, and Kinney were responsible for knowingly or recklessly allowing the material risks of not paying beneficiaries life insurance payments when due and not instituting or maintaining adequate internal controls to monitor the Company's risks, including obligations owed to annuitants and/or the states due to escheatment.  Despite their knowledge or reckless disregard, Hassell, Herzog, Hubbard, Kelly, Kennard, and Kinney permitted, recklessly disregarded, or caused these material risks.

274.     Accordingly, Hassell, Herzog, Hubbard, Kelly, Kennard, and Kinney breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the Finance and Risk Policy Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Compensation Committee – Defendants Grisé, Hassell, Herzog, Kelly, Kilts, and Morrison**

275.     Grisé has been a member of the Compensation Committee from at least 2011 to the present.

276.     Hassell has been a member of the Compensation Committee since 2018.

277.     Herzog has been a member of the Compensation Committee from 2017 to the present.

278.     Kelly has been a member of the Compensation Committee from 2017 to the present.

279.     Kilts has been a member of the Compensation Committee and its Chairman from at least 2011 to the present.

4840-6156-1262, v. 1

280.    Morrison has been a member of the Compensation Committee from 2014 to the present.

281.    The Compensation Committee is responsible for, among other things, approving compensation packages for the CEO (Kandarian) and other executive officers and ensuring that MetLife's compensation programs do not encourage excessive or inappropriate risk taking.  As members of the Compensation Committee, Grisé, Hassell, Herzog, Kelly, Kilts, and Morrison breached their fiduciary duty of loyalty and good faith including but not limited to their approval of compensation to Kandarian, Hele, and other executive officers, approving the MetLife/Hele Separation Agreement, and failing to protect against excessive or inappropriate risk taking.  These directors further supported and permitted the characterization of the public disclosures relating to alleged compensation reductions to Kandarian and Hele as discussed herein.

282.    Based thereon, Grisé, Hassell, Herzog, Kelly, Kilts, and Morrison face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

## COUNT I

### (Against the Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5)

283.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

284.    During the Relevant Period, the Defendants disseminated or approved public statements that failed to disclose (a) that MetLife's practices and procedures used to estimate its reserves set aside for annuity and pension payments were inadequate; (b) that MetLife had inadequate internal controls over financial reporting; and (c) that as a result, the Company's reserves were inaccurate, insufficient, and misstated.  Thus, the price of the Company's shares was artificially inflated due to the conduct of the Defendants.  Despite this artificial inflation in the

99

price of the Company's shares, the Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing financial harm to the Company.

285.    As alleged herein, MetLife and Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding MetLife, their control over, and/or receipt and/or modification of MetLife's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning MetLife, participated in the fraudulent scheme alleged herein.

286.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Defendants.

287.    The Director Defendants were each members of MetLife's Board of Directors during the aforesaid time period.  Based on their roles at MetLife, each of the Director Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

288.    At a minimum, the Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at

MetLife, the Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

289.    Likewise, the Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

290.    The allegations above also establish a strong inference that MetLife, as an entity, acted with corporate scienter throughout the Relevant Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing MetLife's true operating condition and present and expected financial performance from investors. By concealing these material facts from investors, the common stock price of MetLife stock was maintained and/or increased to artificially inflated levels throughout the Relevant Period.

291.    As such Defendants caused the Company to violate Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

4840-6156-1262, v. 1

(a)   employed devices, schemes, and artifices to defraud; and

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

292.   As a result of the Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

## <u>COUNT II</u>

### <u>(Derivative Claim for Violations of Section 20(a) of the Exchange Act<br>Against Defendant Kandarian)</u>

293.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

294.   This Count is asserted on behalf of the Company against Defendant Kandarian for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

295.   During his tenure as an executive officer and/or Chairman of the Board, Defendant Kandarian was a controlling person of all officers of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of his control, Defendant Kandarian had the power and authority to direct the management and activities of the other Company officers, to hire and fire the other Company officers at whim, and to cause the other Company officers to engage in the wrongful conduct complained of herein.  Defendant Kandarian was able to and did control, directly or indirectly, the content of the public statements made by all other Company officers during the Relevant Period, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

296.   In his capacity as the senior executive, and Chairman of the Board of MetLife, Defendant Kandarian had direct involvement in and oversight over the day-to-day operations of the Company officers and the Company's employees, who would not act unless Defendant Kandarian agreed with his course of conduct.

297.   As a result of the foregoing, Defendant Kandarian, individually, was a controlling person of the other Company officers within the meaning of Section 20(a) of the Exchange Act.

298.   As a direct and proximate result of Defendant Kandarian's conduct, the Company suffered damages in connection with its purchase of MetLife common stock at materially inflated prices.

<u>**COUNT III**</u>

**(Against the Director Defendants for Breach of Fiduciary Duty)**

299.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

300.   The Director Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty and due care.

301.   The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

302.   The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to estimate its reserves set aside for annuity and pension payments, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place

regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

303.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

304.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT IV

### (Against the Director Defendants for Waste of Corporate Assets)

305.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

306.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

307.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) purchasing MetLife stock at artificially inflated values; and (iv) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle actions addressing Defendants' unlawful actions.

4840-6156-1262, v. 1

308.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

309.    Plaintiff, on behalf of MetLife, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)    Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)    Finding Defendants liable for breaching their fiduciary duties owed to the Company;

(C)    Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)    Awarding damages to the Company for the harm the Company suffered as a result of the Defendants' wrongful conduct;

(E)    Awarding damages to the Company for Defendants' violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5;

(F)    Awarding damages to the Company for Defendant Kandarian violations of Section 20(a) of the Exchange Act;

(G)    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(H)    Awarding such other and further relief as is just and equitable.

4840-6156-1262, v. 1

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: December 2, 2019

**PRICKETT, JONES & ELLIOT, P.A.**

By: */s/ Samuel L. Closic*
Samuel L. Closic (Del. Bar No. 5468)
Kevin H. Davenport (Del. Bar No. 5327)
Eric J. Juray (Del. Bar No. 5765)
1310 N. King Street
Wilmington, DE 19801
Telephone: (302) 888-6500
Email: KHDavenport@prickett.com
Email: SLClosic@prickett.com
Email: EJJuray@prickett.com

**GAINEY McKENNA & EGLESTON**

Gregory M. Egleston
Thomas J. McKenna
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiff*
