IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALLAN KATES, derivatively on behalf of )
METLIFE, INC., )
                                     )
            Plaintiff, )
                                       )
      v. )       C.A. No. 19-1266-LPS-JLH
                                         )
STEVEN A. KANDARIAN, *et al.*, )
                                         )
           Defendants, )
                                         )
     and )
                                         )
METLIFE, INC., a Delaware corporation, )
                                         )
          Nominal Defendant. )

## REPORT AND RECOMMENDATION

In this shareholder derivative action, the board members named as defendants move to dismiss the Second Amended Complaint for failure to state a claim and failure to make a pre-suit demand. (D.I. 34.) I recommend that the motion be GRANTED because (1) Plaintiff fails to state a federal claim and (2) considerations of judicial economy, convenience, and fairness to the parties do not support the Court's exercise of supplemental jurisdiction over the state-law claims.

## I.     BACKGROUND[1]

### A.     The Parties

Plaintiff Allan Kates ("Plaintiff" or "Kates") is a longtime shareholder of MetLife, Inc. ("MetLife" or "the Company"), a Delaware corporation with "principal executive offices" in New York. (SAC ¶¶ 17-18.) MetLife provides life insurance, annuities, employment benefits, and

---

[1] The facts contained in this section are taken from the allegations in the Second Amended Complaint (D.I. 34 ("SAC")), documents it references or relies on, and matters of which the Court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

management products in the United States and abroad.  (*Id.* ¶ 18.)

The SAC asserts derivative claims on behalf of MetLife against current and former members of its board of directors (the "Director Defendants"), many of whom also held positions on various board committees.  (*Id.* ¶¶ 19-39.)  Defendant Steven A. Kandarian ("Kandarian") was the President and Chief Executive Officer of MetLife between May 1, 2011 and April 30, 2019, and was the Chairman of the Board from January 1, 2012 to April 30, 2019.  (*Id.* ¶¶ 19-21.)  The remaining Defendants—Cheryl W. Grisé,  Carlos M. Gutierrez, Gerald L. Hassell, David L. Herzog, R. Glenn Hubbard, Edward J. Kelly, III, William E. Kennard, James M. Kilts, Catherine R. Kinney, Diana McKenzie, and Denise M. Morrison—are or were members of the Board at some point between 2013 and the present.

### B.    MetLife's Group Annuity Payment Practices

According to the SAC, MetLife's United States business is organized into "three main segments."  (*Id.* ¶¶ 2, 63.)  Relevant here is its Retirement and Income Solutions ("RIS") segment.  (*Id.* ¶¶ 2, 63-65.)  MetLife's RIS business "provides funding and financing solutions that help institutional customers mitigate and manage liabilities primarily associated with their qualified, nonqualified and welfare employee benefit programs using a spectrum of life and annuity-based insurance and investment products."  (*Id.* ¶ 65.)

One of MetLife's RIS product lines is pension risk transfers.  (*Id.* ¶¶ 3, 69.)  A pension risk transfer is where an employer defined benefit pension plan uses the plan's funds to purchase a group annuity contract from MetLife.  (*Id.* ¶ 69.)  When the plan beneficiaries reach retirement age, they receive their benefit payments from MetLife.  (*Id.*)  According to the SAC, "[t]he Pension Risk Transfer Process results in employers closing out their pension liabilities and plan beneficiaries becoming entitled to annuity benefits as they reach retirement age."  (*Id.*)  Because group annuity contracts are negotiated solely between the employer and MetLife, plan

beneficiaries may be unaware that the administration of their benefits has transferred from their employer to MetLife.  (*Id.* ¶ 70.)

To satisfy its contractual obligations to pay retirement benefits to plan beneficiaries, MetLife is required to maintain adequate funds in its pension reserve accounts.  (*Id.* ¶ 76.)  When an annuitant dies, MetLife's obligations to pay additional pension benefits terminates, and it reduces its accounting reserves accordingly.  (*Id.*)  MetLife's release of reserves results in a commensurate increase in its earnings.  (*Id.*)

In 2015, the Philadelphia Regional Office of the Department of Labor opened an investigation after receiving complaints from pensioners that they were not receiving their benefits.[2]  (*Id.* ¶ 107.)  At that time, MetLife's process for locating a beneficiary who had reached retirement age consisted of sending two "form letters" to the beneficiary: one when they approached the normal retirement age of 65, and again when they approached the required minimum distribution age of 70.5.  (*Id.* ¶ 206.)  If the beneficiary did not respond after the second letter, MetLife presumed that they were deceased and had never become entitled to pension benefits, and MetLife reduced its reserves accordingly.  (*See id.* ¶ 81.)  The Department of Labor's inquiry prompted MetLife to launch an internal pilot program in August 2016 to determine if the use of additional data sources (in addition to the two letters) would enable MetLife to establish contact with more beneficiaries who had pension benefits coming.

As it turned out, MetLife's two-letter process had, in fact, failed to identify a number of individuals who were alive and thus entitled to pension benefits.  On December 15, 2017, MetLife filed a Form 8-K with the SEC, which stated (in part):

> . . . MetLife has been in the retirement business for many decades.

---

[2] The SAC does not allege that the complainants were entitled to receive pension payments from MetLife (as opposed to another company) or that the Department of Labor was focused on MetLife (as opposed to conducting an industrywide inquiry).

> As practices have evolved, we are improving the process used to locate a small subset of our total group annuitant population of approximately 600,000 that have moved jobs, relocated, or otherwise can no longer be reached via the information provided for them. We currently believe the portion of the subset that is most impacted is less than 5% of our total group annuitant population and they tend to be smaller size cases with average benefits of less than $150 per month.
>
> We are making our process more robust to include a wider set of search techniques and better utilize available technology. Taking these actions would result in strengthening reserves, which in the period recorded may be material to our results of operations and is not reflected in the outlook presented herein. We do not have an estimate at this point but we plan to provide further disclosure on our fourth quarter earnings call and in our annual report on Form 10-K for the year ended December 31, 2017.

(*Id.* ¶ 177.)

The same day, the *Wall Street Journal* published an article entitled, "MetLife Discloses Failure to Pay Thousands of Workers' Pensions." (*Id.* ¶¶ 109, 178.) The article reported that "[s]ome Wall Street analysts assumed that the payments could be 10 or more years overdue," which, "[a]t $150 a month for 30,000 people—5% of the 600,000—. . . could be up to $540 million." (*Id.* ¶ 178.) Three days later, *Pensions & Investments* published an article in which a MetLife representative was quoted as saying that "we have not been as aggressive we could have been" at tracking beneficiaries down. (*Id.* ¶ 179.) The article also reported that the State of Massachusetts had begun an investigation into the issue. (*Id.*) The SAC alleges that "[o]n this news, shares of MetLife fell $0.62 per share or over 1.2% over the next two trading days . . . ." (*Id.* ¶¶ 181, 233.)

On January 29, 2018, MetLife issued a press release in which it announced that the annuity payment issue had caused it to improperly release over $500 million in reserves. (*Id.* ¶ 202.) MetLife indicated that its net income for 2017 was impacted and that it would have to make

revisions to its prior financial statements:

> . . . On its Dec. 15, 2017, Investor Outlook Call, MetLife announced that it was undertaking a review of practices and procedures used to estimate its reserves related to certain Retirement and Income Solutions group annuitants who have been unresponsive or missing over time.
>
> Management of the company has determined the prior release of group annuity reserves resulted from a material weakness in internal control over financial reporting. MetLife expects to increase reserves in total between $525 million and $575 million pre-tax, to adjust for reserves previously released, as well as accrued interest and other related liabilities. . . .
>
> The total amount expected to impact fourth quarter 2017 net income is between $135 million and $165 million pre-tax, the majority of which represents a current period strengthening of reserves and will be reflected in Adjusted Earnings (formerly known as Operating Earnings). We expect the full year 2017 net income impact to be between $165 million and $195 million pre-tax. . . .
>
> Revisions to prior periods will be included in MetLife's 2017 Form 10-K and Fourth Quarter Financial Supplement. . . .
>
> In connection with MetLife's review and enhancement of the processes and procedures relating to its Retirement and Income Solutions business in the United States, MetLife is currently reviewing its processes and procedures for identifying unresponsive and missing international group annuity annuitants and pension beneficiaries. In addition, MetLife recently initiated an ongoing global review of its processes and procedures for identifying unresponsive and missing policyholders and beneficiaries for the other insurance and annuity products it offers. . . .
>
> MetLife had previously informed its primary state regulator, the New York Department of Financial Services, about this matter and is responding to questions from them and other state regulators. The U.S. Securities and Exchange Commission enforcement staff has also made an inquiry regarding this matter and MetLife is responding to its questions. To date, MetLife is not aware of any intentional wrongdoing in connection with this matter.

(*Id.*)  The SAC alleges that "[o]n this news, shares of MetLife fell $6.28 per share or over 11.6% over the next two trading days . . . ."  (*Id.* ¶¶ 203, 235.)

On February 13, 2018, MetLife filed another Form 8-K stating that it had identified "deficiencies in the design and/or execution of internal controls that aggregated to a material weakness." (*Id.* ¶ 204.) According to the filing, "[m]anagement determined that a lack of adequate controls over administrative and accounting practices relating to certain RIS group annuity reserves and the untimely communication and escalation of issues regarding those reserves throughout the Company contributed to the material weakness." (*Id.*) The Form 8-K identified numerous "remediation activities" that MetLife planned to undertake, including the use of modified procedures to locate "unresponsive and missing" annuitants. (*Id.* ¶ 205.)

On an investor conference call the next day, Kandarian stated, "Simply put, this is not our finest hour. We had an operational failure that never should have happened and it is deeply embarrassing." (*Id.* ¶ 206.) Kandarian described the weakness as having two components: (1) "a lack of adequate controls over the administrative and accounting practices that led to the release of the reserves"; and (2) "failure to escalate sooner." (*Id.*)

Less than two weeks later, the news reported that MetLife's Executive Vice President of RIS was retiring, effective March 1, 2018. (*Id.* ¶¶ 207-10.) On April 26, 2018, MetLife announced that it was cutting the pay of Kandarian and MetLife's CFO "in consideration of the Company's performance in managing financial matters." (*Id.* ¶¶ 211-13.) Days later, the CFO retired. (*Id.* ¶¶ 214-15.) On January 8, 2019, MetLife announced that Kandarian would be replaced as CEO and Chairman of the Board, effective April 30, 2019. (*Id.* ¶¶ 218-20.)

### C.    MetLife's 2018 and 2019 Settlements with State Regulators

In June 2018, the Massachusetts Securities Division's Enforcement Section filed an administrative complaint against MetLife, alleging that it violated the Massachusetts Uniform Securities Act when it misstated the Company's finances in connection with its improper release of reserves for annuitants who had not died. (*Id.* ¶¶ 182-87) That litigation was resolved with a

December 18, 2018 consent order in which MetLife "neither admit[ted] nor denie[d]" the allegations, but agreed to pay a $1 million administrative fine and to adopt certain practices for locating missing annuitants.  (D.I. 52, Ex. A; SAC at 2; *id.* ¶¶ 188-92.)

The New York Department of Financial Services also conducted an investigation into MetLife's handling of group annuity payments.  That investigation concluded on January 28, 2019 with the entry of a consent order in which MetLife agreed to pay a $19.75 million fine and $189 million in restitution.  (*Id.* ¶¶ 193-94.)  The New York consent order also required MetLife to adopt certain practices for locating annuitants.  (*Id.* ¶¶ 193-95.)

### D.    Additional Allegations Supporting Plaintiff's Securities Fraud Claims

In this case, Kates alleges that the Director Defendants violated federal antifraud securities laws when they "disseminated or approved public statements" between February 27, 2013 and the present ("the Relevant Period") that "failed to disclose (a) that MetLife's practices and procedures used to estimate its reserves set aside for annuity and pension payments were inadequate; (b) that MetLife had inadequate internal controls over financial reporting; and (c) that as a result, the Company's reserves were inaccurate, insufficient, and misstated."  (*Id.* ¶¶ 1, 284.)  As discussed in more detail below, the securities fraud claim is premised on Plaintiff's contention that the Director Defendants acted with scienter when they failed to disclose in SEC filings and elsewhere that MetLife's two-letter procedure for identifying pension annuitants was "inadequate," which resulted in MetLife improperly releasing reserves.  (*Id.* ¶¶ 89, 104, 133, 200.)

In particular, Plaintiff alleges that the Director Defendants knew about MetLife's inadequate procedures back in 2012, when MetLife entered into a settlement agreement with state regulators related to its payment of death benefits.  Plaintiff alleges that the Director Defendants' knowledge is further evidenced by an internal audit report in 2016 that identified weaknesses in MetLife's internal controls relating to pension annuities.  Plaintiff alleges that, despite knowing

7

about those problems, the Director Defendants made and caused MetLife to make false and misleading statements about the adequacy of its internal controls.  I discuss the portions of the SAC supporting each of those allegations below.

### 1. The multi-state investigation and 2012 settlement

As explained above, prior to 2018, MetLife used a two-letter procedure for locating a pension annuitant who had reached retirement age.  If the annuitant failed to respond to the second letter, MetLife presumed that they were deceased and released reserves.  The SAC alleges that the two-letter process was inadequate.  According to the SAC, MetLife should have instead utilized the Social Security Administration's Death Master File ("DMF"), a government database listing deaths, to confirm that the missing pension annuitants were in fact deceased.  (*Id.* ¶¶ 83, 161, 168, 200.)  But the SAC does not identify any positive law that requires companies to use the DMF or any other particular method to locate pension annuitants.  (Dkt. Minute Entry, 5/13/2020 ("Tr.") 38:7-13.)

Instead, the SAC alleges that the Director Defendants knew or should have known that the two-letter procedure was inadequate as a result of a 2012 settlement agreement between MetLife and six state insurance departments.  That agreement was the culmination of a multi-state investigation that began in 2009 into MetLife's procedures for paying death benefits.  (SAC ¶ 77.)  The investigation revealed that MetLife had been relying on the DMF to cut off payments to current annuitants who were listed as deceased, but it did not use the DMF listings to identify when beneficiaries were entitled to death benefits under annuity contracts or life policies.  (*Id.* ¶¶ 77-86; *id.*, Ex. 2 at 1; D.I. 50, Ex. 2 at 1.)[3]  Pursuant to the 2012 settlement agreement, MetLife reimbursed the states $40 million for the costs of the investigation and paid $460 million to beneficiaries who

---

[3] Plaintiff filed the exhibits to the SAC in a separate filing on May 12, 2020.  (D.I. 50.)

were entitled to receive death benefits.[4]  (SAC ¶ 86; *id.*, Ex. 2.)  MetLife also agreed that, going

forward, it would conduct a "Thorough Search" for beneficiaries entitled to receive death benefit

proceeds, including by searching various databases and by attempting to contact the beneficiaries

by phone and e-mail.  (*Id.* ¶ 87.)

The 2012 settlement agreement did not implicate MetLife's pension risk transfer business

because the "Thorough Search" was only required for beneficiaries who were "entitled to receive

. . . death benefit proceeds."  (*Id.* ¶ 88; *id.*, Ex. 2 at 3.)  The agreement explicitly excluded

"employment-based retirement plan[s] where MetLife is not committed by the terms of the annuity

contract to pay death benefits to the beneficiaries of specific plan participants."  (*Id.*)

At the time of the 2012 settlement, Defendants Kandarian, Grisé, Hubbard, Kilts, and

Kinney were members of the Board.  (*Id.* ¶ 90.)

### 2.   The 2016 internal audit report

The SAC also alleges that a 2016 internal audit report evidences the Director Defendants'

prior knowledge of MetLife's inadequate procedures for locating annuitants.  On September 26,

2016, MetLife's Chief Auditor presented an "Internal Auditor's Report" to the Board's Audit

Committee.  (*Id.* ¶ 98, Ex. 3; D.I. 50, Ex. 3.)  Defendants Kandarian, Grisé, Kinney, and Kelly

were present at the meeting.  (SAC ¶ 99.)

Plaintiff attached a copy of the underlying "Internal Audit Report" (dated June 29, 2016)

as Exhibit 3 to the SAC.  (*Id.* ¶ 98, Ex. 3.)  The SAC correctly quotes the audit report's

identification of "control weaknesses . . . over several areas, including contract accuracy, manual

certificate mailings, and retirement letter mailings (e.g. age 65 and 70.5)."  (*Id.* ¶ 101; *id.*, Ex. 3 at

2.)  The SAC also correctly quotes the audit report's finding that "[o]pportunities exist to enhance

---

[4] MetLife disputes Plaintiff's assertion that the 2012 settlement involved restitution.  (D.I. 34 at 5 n.3.)

existing controls to ensure timely processing of held and suspended payments as well as retirements." (*Id.*)

But the SAC does not include the audit report's explanation of what those control weaknesses and opportunities to enhance controls were.[5]  The copy of the audit report filed with the SAC explains that the "manual certificate mailing" issue was related to ensuring that "state-specific forms" were being mailed with annuitant certificates.  (*Id.*, Ex. 3 at 4.)  The audit report goes on to explain that the "retirement letter mailings" issue was related to the audit team's finding that a sample of annuitants did not receive timely mailings at age 65 and 70.5 because they were in a "deferred status" and had not been loaded into MetLife's new software platform until after their normal retirement date.  The audit report stated that the "Management Action Plan" to fix that issue involved "track[ing] the ages, monthly, of deferred lives" during the software platform implementation phase and "manually process[ing] age 65 and 70.5 letters."   (*Id.*)  As for the "timely processing of . . . retirements" issue, the audit report explains that it had to do with an administrator not having appropriate access to MetLife's new software platform, which resulted in some retirements not being processed "within the established time service standards."  (*Id.* at 6.)

### 3.   Alleged material misstatements and omissions

The SAC alleges that the Director Defendants caused MetLife to make numerous misstatements and omissions in its financial documents between February 27, 2013, and the present.  (SAC ¶¶ 107-76.)  The allegations can generally be categorized into two theories: (1) MetLife made false statements and omissions regarding its conduct and accounting practices; and

---

[5] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (courts may, on a motion to dismiss, consider documents integral to or explicitly relied on in the complaint); *see also Tellabs*, 551 U.S. at 322.

(2) MetLife made false statements and omissions regarding its compliance with SEC standards.

Plaintiff's first theory focuses on SEC filings between 2013 and 2017 in which management opined that MetLife's internal controls were adequate.  (Tr. at 47:3-48:5; *see, e.g.*, SAC ¶ 114 ("Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective."); *id.* ("In the opinion of management, MetLife, Inc. maintained effective internal control over financial reporting at December 31, 2012."); *see also id.* ¶¶ 113, 115-19, 121-23, 126-28, 131-32.)  Plaintiff alleges that those statements were materially false and misleading and omitted material information because the Board knew that MetLife had material control weaknesses related to its use of the two-letter procedure to locate pension annuitants and its corresponding release of reserves.  (*Id.* ¶¶ 105, 133.)  The SAC alleges that MetLife made similar statements and omissions regarding the adequacy of its accounting reserves.  (*Id.* ¶¶ 155-62.)  The SAC also alleges that MetLife and the Director Defendants should have, but did not, disclose that "MetLife's practice for locating pension risk transfer annuitants was illegal and improper."  (*Id.* ¶ 164; *see also id.* ¶¶ 163-70.)

Plaintiff's second theory focuses on MetLife's statements and omissions regarding its compliance with GAAP (generally accepted accounting principles) and SEC regulations that mandate compliance with GAAP.  In general, Plaintiff alleges that MetLife's financial statements between 2013 and 2017 misrepresented its compliance with GAAP because they underestimated the required reserves for the pension risk transfer business and, thus, overstated earnings.  (*Id.* ¶¶ 138-54.)  The SAC alleges that MetLife similarly violated an SEC Regulation that mandates disclosure of known risks and uncertainties that may have a materially adverse impact on income. (*Id.* ¶¶ 171-76.)

E.      **Procedural History**

Often, securities fraud cases are filed by shareholders who allege that they relied on a company's misstatements (or the market's evaluation of those misstatements, as reflected by the market price) when they purchased shares, and they allege that they suffered a loss in connection with the fact that they paid too much.  That is not the case here.

In this case, Plaintiff is purporting to bring a derivative suit on behalf of MetLife on the theory that MetLife was defrauded when it repurchased its own securities from the open market at inflated prices between 2013 and 2019.  (*Id.* ¶¶ 120, 124-25, 129-30, 134-37, 224-30, 283-92.) Stated another way, Plaintiff alleges that MetLife was defrauded by material misstatements and omissions in its own public filings (that the Director Defendants caused MetLife to issue).  (*See, e.g., id.* ¶¶ 284, 291.)  Plaintiff did not make a demand on the Board to institute this action against the Director Defendants, and he alleges that demand would have been futile.  (*Id.* ¶¶ 239-82.)

Plaintiff filed his original shareholder derivative complaint on January 18, 2019, in the Eastern District of New York.  (D.I. 1.)  On June 28, 2019, Plaintiff filed a first amended complaint. (D.I. 10.)  On July 8, 2019, the case was transferred to this district pursuant to the parties' stipulation.  (D.I. 12.)  On October 11, 2019, Defendants moved to dismiss the first amended complaint for failure to state a claim.  Plaintiff responded by filing a second amended complaint on December 2, 2019.  (D.I. 31.)

The SAC has four counts.  Count I alleges that the Director Defendants violated § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.  (*Id.* ¶¶ 283-92.)  Count II alleges that Defendant Kandarian violated § 20(a) of that Act.  (*Id.* ¶¶ 293-98.)  Counts III and IV allege state-law claims of breach of fiduciary duty and waste of corporate assets.  (*Id.* ¶¶ 299-309.)

On January 14, 2020, Defendants filed a motion to dismiss the SAC under Federal Rule of

Civil Procedure 23.1 for failure to make demand and under Rule 12(b)(6) for failure to state a claim.  (D.I. 34.)  I heard oral argument on May 13, 2020, and I ordered the parties to file supplemental briefs on two issues.  (Dkt. Minute Entry, 5/13/2020; D.I. 52, 53.)

## II.       LEGAL STANDARDS

### A.       Motion to Dismiss for Failure to State a Claim

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  A possibility of relief is not enough.  *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In determining the sufficiency of the complaint under the plausibility standard, all "well-pleaded facts" are assumed to be true, but legal conclusions are not.  *Id.* at 679.  "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (internal marks omitted).

### B.       Securities Fraud Pleading Requirements

Section 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ, in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device

13

or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements that prohibition by declaring it unlawful to make "any untrue statement of a material fact or [the omission of] a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of any security.  17 C.F.R. § 240.10b–5.  To adequately allege a securities fraud claim under § 10(b) and SEC Rule 10b-5, the complaint must plead "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).

Complaints alleging securities fraud must also satisfy the "heightened pleading rules" in the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b)(1).  *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).  The complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u–4(b)(1)(B); *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016).  "A complaint must also 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,'" specifically, "scienter."  *OFI Asset Mgmt.*, 834 F.3d at 490 (quoting *Avaya*, 564 F.3d at 252).

14

## III.    DISCUSSION

Defendants argue that Plaintiff's derivative securities fraud claim "borders on nonsensical, as MetLife could not have fraudulently misled itself."  (D.I. 35 at 11.)  To their point, it is unclear to the undersigned how Plaintiff intends to establish that MetLife relied on alleged false statements and omissions in its public filings when the SAC specifically alleges that MetLife knew they were false.[6]  (SAC ¶ 285 ("MetLife and Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading."); *id.* ¶ 290 ("MetLife, as an entity, acted with corporate scienter. . . .").)

I don't need to sort that out here, however, because Plaintiff fails to state a securities fraud claim for another reason.  Notwithstanding the length of the SAC—309 paragraphs spanning 106 pages—the facts alleged do not give rise to a strong inference that the Director Defendants acted with scienter.  Accordingly, I recommend dismissal of the securities fraud claims.  I also recommend that the Court decline to exercise jurisdiction over the state-law claims.

### A.    The § 10(b) Claim Should be Dismissed Because the SAC Does Not Plead Facts Giving Rise to a Strong Inference of Scienter.

Defendants argue that the SAC "fails, with respect to any Defendant, to allege with particularity facts giving rise to a strong inference that the defendant acted with intent to defraud." (D.I. 35 at 15.)  I agree.

The "scienter" element of a securities fraud claim is defined as a "'knowing or reckless' mental state 'embracing intent to deceive, manipulate, or defraud.'"  *OFI Asset Mgmt.*, 834 F.3d

---

[6] The SAC refers to the "fraud on the market" doctrine, which entitles plaintiffs to a presumption of reliance on material misrepresentations made to the public.  (SAC ¶¶ 224-230.) *See Basic Inc. v. Levinson*, 485 U.S. 224, 241-47 (1988).  But that presumption can be rebutted with evidence that the plaintiff "would have traded despite . . . knowing that statement was false." *Id.* at 248.  Here, the SAC specifically alleges that MetLife did know that the challenged statements were false and made the stock repurchases anyway.

at 490 (quoting *Avaya*, 564 F.3d at 252). "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Avaya*, 564 F.3d at 267 n.42 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999), *abrogated on other grounds by Tellabs*, 551 U.S. 308).

"Claims essentially grounded on corporate mismanagement do not adequately plead recklessness." *Id.* In order to plead scienter grounded in recklessness, the facts pleaded must lead to an inference "that the danger of misleading investors was either actually 'known' by Defendants or 'so obvious that [they] must have been aware of it.'" *Fain v. USA Techs., Inc.*, 707 F. App'x 91, 96 (3d Cir. 2017) (quoting *In re Advanta*, 180 F.3d at 549).

Not only must the complaint give rise to an inference of scienter, it must also comply with the PSLRA's requirement that the inference be "strong." 15 U.S.C. § 78u–4(b)(2)(A). What that means is that a complaint may only survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. In conducting the analysis, courts must consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.*; *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114-15 (3d Cir. 2018). When doing so, however, courts must ensure that they do not "scrutinize each allegation in isolation." *Tellabs*, 551 U.S. at 326. Rather, the court's job is to "assess all the allegations holistically." *Id.*; *In re Hertz*, 905 F.3d at 114. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326.

16

Plaintiff contends that the Director Defendants caused MetLife to make numerous misstatements and omissions about the adequacy of its internal controls and its compliance with SEC standards.[7]  But Plaintiff's brief gives the scienter element only cursory treatment.  Plaintiff contends that the SAC contains "allegations showing that Defendants have long been aware of the Company's inadequate practice in locating annuitants for the Pension Right [sic] Transfer business and improperly releasing pension fund reserves in violation of both federal and states [sic] regulatory requirements."  (D.I. 36 at 19.)  Plaintiff argues that the SAC's factual allegations, "taken collectively" or "even considered individually," give rise to a strong inference of scienter. (*Id.* at 19 n.24.)

The Third Circuit has instructed that courts may conduct "scienter analyses that assess individual categories of scienter allegations individually" if the court "ultimately consider[s] the allegations as a whole."  *In re Hertz*, 905 F.3d at 115.  That is the approach I will take here.   I have carefully analyzed the SAC in its entirety.   Setting aside conclusory allegations of mental states, it appears to me that there are four main categories of allegations that could contribute to an inference of scienter on the part of the Director Defendants: (1) the multi-state investigation and the subsequent 2012 settlement; (2) the 2016 internal audit report; (3) the DOL investigation and pilot program; and (4) the Massachusetts and New York investigations and consent orders.  I discuss each in turn.

### 1. The multi-state investigation regarding payment of death benefits and 2012 settlement

Plaintiff claims that the Director Defendants' knowledge of the multi-state investigation

---

[7] At oral argument, counsel for Plaintiff stated that "the specific statements that are false and misleading are statements in the annual proxies and the 10-Ks regarding the effectiveness of the company's internal control" and "related . . . technical misstatements related to compliance with GAAP and the treatment of the reserves."  (Tr. at 47:3-48:5.)

and 2012 settlement regarding MetLife's payment of death benefits establishes that Defendants knew or were reckless in not knowing that MetLife's practice for locating living pension annuitants was improper.  (SAC ¶¶ 85, 89-90, 256-57.)  As an initial matter, the SAC does not cite to any internal reports, statements of witnesses, or any other specific facts demonstrating that any one of the Director Defendants was on notice that there was a problem with respect to the particular procedure challenged here: MetLife's use of the two-letter procedure to identify and locate living pension annuitants who had reached retirement age.

I accept as true the SAC's allegation that at least some of the Director Defendants knew about the multi-state investigation and MetLife's subsequent 2012 settlement.  But that investigation and settlement dealt with a different issue, namely, MetLife's procedure for identifying and locating beneficiaries entitled to death benefits upon the death of a contract holder. Knowledge of that settlement, without more, does not give rise to a cogent inference that the Director Defendants knew or were reckless to ongoing issues with respect to MetLife's procedure for locating living pension annuitants.  Indeed, there are no specific facts suggesting that the Director Defendants knew prior to 2017 that MetLife even used the two-letter procedure to determine which pension annuitants were alive.

Even assuming for the sake of the argument that the Director Defendants were aware of MetLife's procedures to locate pension annuitants, the SAC does not allege facts supporting a strong inference that they knew (or obviously must have known) that it was improper or inaccurate. The SAC does not identify any positive law that requires companies to use the DMF or any other particular method to locate pension annuitants.  (Tr. 38:7-13.)  And it is not enough to plead that the Director Defendants should have known (as a result of the 2012 settlement) that the Company's procedure to locate annuitants might later be scrutinized: negligence does not amount to scienter.

Plaintiff must plead facts showing that it was "so obvious" that MetLife was required to use the same procedures to identify living pension annuitants (who presumably know they have benefits coming) and beneficiaries entitled to death benefits (where the policyholder is deceased), that the Director Defendants "must have been aware." *In re Advanta*, 180 F.3d at 535.  The SAC fails to meet that standard.

In addition, the 2012 settlement explicitly excluded "employment-based retirement plan[s] where MetLife is not committed by the terms of the annuity contract to pay death benefits to the beneficiaries of specific plan participants."  (SAC ¶ 88; *id.*, Ex. 2 at 3.)  Plaintiff suggests that MetLife "deliberate[ly]" excluded pension annuitants from the agreement because it knew its procedure to identify those individuals was improper (D.I. 36 at 5; SAC ¶ 89), but that's a stretch on the facts alleged.  Another plausible inference is that the individuals negotiating the settlement were unaware that MetLife's procedure to locate living pension annuitants was inaccurate.  Even more importantly, there are no facts connecting the exclusion of pension annuitants from the 2012 settlement to any of the Director Defendants.  At best, this category of allegations provides some inference of scienter, but not a strong inference.

### 2.  The 2016 internal audit report

Plaintiff also alleges that the Director Defendants were aware of the July 29, 2016 audit report described above.  (SAC ¶ 104.)  Even assuming that all of the Director Defendants were privy to that report (which Defendants dispute), it does not support an inference of scienter.

The audit report makes no mention of any issues relating to MetLife's use of the two-letter procedure to identify and locate living pension annuitants.  The SAC selectively quotes language referring to "control weaknesses" over "retirement letter mailings" but, as explained above, the specific issues identified in that report were unrelated.

If anything, the audit report weighs against an inference of scienter.  Although it identified specific control weaknesses in MetLife's processes that required corrective action, it also contained a "Manager Action Plan" to implement the correction.  Nothing about the audit report itself suggests that control weaknesses were being ignored.  Plaintiff asks the Court to draw an inference that the audit report put the Director Defendants on notice of problems with retirement letter mailings, but a more plausible inference is that the Director Defendants believed that the Company was taking corrective action with respect to known issues.

### 3.   The DOL investigation and the pilot program

Plaintiff claims that the Department of Labor's investigation and MetLife's subsequent initiation of the pilot program supports a strong inference of scienter.  (SAC ¶ 111.)  I disagree.

For one thing, a government investigation does not itself give rise to a cogent inference of scienter.  *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 114-15 (D. Mass. 2014).  Moreover, the SAC lacks facts suggesting that any of the individual Director Defendants knew about the DOL investigation or the pilot program at the time of any alleged misrepresentation.  Nor does the fact that MetLife instituted a pilot program to examine alternative procedures for locating pension annuitants raise an inference that the Director Defendants knew that its prior procedures were improper.  The more compelling inference on the facts alleged is that, once the Director Defendants became aware of the results of the pilot program, they disclosed the issues through public filings.

### 4.   The Massachusetts and New York investigations and consent orders

Plaintiff claims that the Massachusetts and New York consent orders support an inference of scienter.  (*Id.* ¶¶ 191, 195.)  A government investigation can certainly be considered as a "piece of the puzzle when taking a 'holistic view' of the purported facts as they relate to scienter," but

the existence of the investigation alone cannot itself "give rise to a requisite cogent and compelling inference of scienter." *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013). Here, both state investigations apparently began after the latest statement alleged to violate § 10(b). (*Id.* ¶¶ 132, 180, 188, 193.) Indeed, the SAC suggests that the impetus for the investigations was MetLife's own disclosure of the reserve issue. (*Id.* ¶ 186.) Consequently, the existence of the state investigations does not strongly support an inference that the Director Defendants knew about the reserve issues prior to disclosing them.

As for the consent orders themselves, in which MetLife agreed to pay fines and adopt certain practices, I accept for the purposes of the argument that they provide some inference of scienter. However, the inferential force of those orders is lessened by the fact that the SAC does not provide particularized allegations of fraudulent intent on the part of the individual Director Defendants. *See, e.g., Teamsters Local 456 Pens. Fund v. Universal Health Servs.*, C.A. No. 17-cv-2817, 2020 WL 2063474, *15 (E.D. Pa. Apr. 29, 2020) (holding that the mere fact that a company settled a government investigation was insufficient to support an inference that the individual defendants had actual knowledge of the violations).

### 5. Other allegations

I have also taken into account other allegations in the SAC that might be argued to support an inference of scienter. For example, I have considered the fact that MetLife's use of the two-letter procedure caused it to improperly release over $500 million in reserves, which necessitated an increase in reserves and an equivalent charge. (SAC ¶ 157.) I have taken into account MetLife's 2018 disclosure that the problem arose from "a lack of adequate controls over the administrative and accounting practices that led to the release of the reserves" and "failure to escalate sooner." (*Id.* ¶ 206.) I have considered Plaintiff's allegation that pension risk transfers were a "core"

element of MetLife's business.  (*Id.* ¶¶ 71, 76.)  I have also considered Defendant Kandarian's

industry expertise and the fact he was replaced as CEO and Chairman a year after the issues were

disclosed.  (*Id.* ¶¶ 112, 218-20.)

I have accepted all of those allegations as true, and I have considered them and all of the

rest of the allegations in the complaint, and I conclude that they do not give rise to a cogent

inference of scienter on the part of the Director Defendants.  *See, e.g.*, *In re Hertz*, 905 F.3d 106,

116 ("A company's admission even to significant accounting errors . . . 'is insufficient by itself to

give rise to a strong inference of scienter.'") (quoting *Podraza v. Whiting*, 790 F.3d 828, 838 (8th

Cir. 2015)); *id.* at 118 ("Corporate resignations do not strengthen an inference of scienter, when

. . . the allegations do not cogently suggest that the resignations resulted from the relevant

executives' knowing or reckless involvement in a fraud."); *Martin v. GNC Holdings, Inc.*, 757 F.

App'x 151, 155 (3d Cir. 2018) (holding that the "core operation doctrine" did not support a finding

of scienter "absent some additional allegation of specific information conveyed to management

and related to the fraud") (quoting *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049,

1068 (9th Cir. 2008)); *Abely v. Aeterna Zentaris Inc.*, C.A. No. 12-cv-4711, 2013 WL 2399869, at

*18 (S.D.N.Y. May 29, 2013) ("Allegations of a defendant's experience and expertise . . . are

insufficient to raise an inference of scienter.").

### 6.  Holistic review

I have also considered the factual allegations holistically.  They do not support an inference

of knowledge or recklessness on the part of the individual Director Defendants that is as least as

strong as any opposing inference.  Taking all of the facts together, the most plausible inference is

that the Director Defendants disclosed the issues when they found out about them.  That is not to

say that I am discounting the seriousness of the problem.  I am not.  But internal management

problems are not actionable under the securities fraud laws unless they involve scienter.  And the facts alleged here do not suggest that the individual Director Defendants were engaged in a fraud.

In sum, the facts alleged do not give rise to a cogent inference that the Director Defendants knew that MetLife was releasing accounting reserves when a pension annuitant failed to respond to two letters, that they knew that the practice was improper, that they knew it was inaccurate, that they knew that it materially affected the Company's accounting, or that MetLife's errors "were so obvious that only an attitude of reckless disregard on the part of the [Director] Defendants can explain what they said and did."  *In re Hertz.*, 905 F.3d at 121.  Accordingly, I recommend that the § 10(b) claim (Count I) be dismissed.

### B.      The § 20(a) Claim Should Also be Dismissed.

Liability under § 20(a) requires an underlying violation of a federal securities law or rule.[8] *Id.*; *see, e.g.*, *OFI Asset Mgmt.*, 834 F.3d at 505 (dismissing § 20(a) claim because the plaintiff failed to state a claim under § 10(b)).  Because the SAC fails to state a claim under § 10(b), there is no predicate violation for liability under § 20(a).  I therefore recommend that the § 20(a) claim be dismissed.[9]

_____

[8] Section 20(a) of the Securities Exchange Act of 1934 provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

[9] Because I conclude that the SAC fails to state securities fraud claims under Rule 12(b)(6), I do not need to address Defendants' alternative argument that the claims should be dismissed for failure to plead demand futility.  I nevertheless agree with Defendants that the federal securities fraud claims should also be dismissed on that basis.  A plaintiff seeking to bring a derivative suit on behalf of a corporation must comply with Federal Rule of Civil Procedure 23.1, which requires

### C.    The Court Should Decline to Exercise Jurisdiction over the State-Law Claims.

The SAC alleges that the Court has jurisdiction over the state-law claims under 28 U.S.C.

§ 1367.  (SAC ¶ 13.)  That statute permits a federal court to exercise jurisdiction over state-law

claims related to asserted claims over which the court has original jurisdiction.   28 U.S.C.

§ 1367(a).   However, under  § 1367(c)(3), the Court "may decline to exercise supplemental

jurisdiction" over the state-law claims if it "has dismissed all claims over which it has original

jurisdiction[.]" 28 U.S.C. § 1367(c)(3).   And "[i]t '*must* decline' to exercise supplemental

jurisdiction in such circumstances 'unless considerations of judicial economy, convenience, and

fairness to the parties provide an affirmative justification for doing so.'" *Stone v. Martin*, 720 F.

App'x 132, 136 (3d Cir. 2017) (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000)

(emphasis in original)).

I find that there is no affirmative justification supporting the exercise of jurisdiction over

---

pleading "with particularity" the plaintiff's demand that the board initiate litigation or the reasons why demand is excused.  Fed. R. Civ. P. 23.1(b)(3).  Whether demand is excused as futile is determined by the law of the state of incorporation.  *Kantor v. Barella*, 489 F.3d 170, 176 (3d Cir. 2007).

Where, as here, the suit challenges board inaction, a plaintiff who fails to make a pre-suit demand must plead particularized factual allegations demonstrating "a reasonable doubt" that a majority of the board is incapable of making a disinterested and independent judgment as to whether the corporation should pursue the claims.  *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993), *abrogated on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  Demand futility is analyzed on a claim-by-claim basis. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 833 A.2d 961, 977 (Del. Ch. 2003).

The SAC fails to plead facts showing that a majority of the board lacked independence.  Plaintiff's argument to the contrary largely consists of conclusory allegations related to Defendants' compensation and participation on board committees.  Those allegations, without more, are insufficient.  *See Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988), *abrogated on other grounds by Brehm*, 746 A.2d 244; *White v. Panic*, 793 A.2d 356, 366 (Del. Ch. 2000).

Nor does the SAC plead facts showing interestedness.  To plead interestedness with respect to his federal securities fraud claims, Plaintiff must allege particularized facts demonstrating a "substantial likelihood" of liability.  *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007).  As explained above, Plaintiff fails to state a claim under the federal securities laws.  There is thus no likelihood of liability.

the state-law claims.[10]   While this Report and Recommendation focuses on the federal claims (which are the reason this case is in district court instead of the Delaware Court of Chancery), much of the SAC relates to Plaintiff's claim that the Director Defendants breached their duty to reasonably oversee the Company's affairs (Count III)—a so-called *Caremark* claim.[11]   *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).   A derivative action asserting a *Caremark* claim against the same Director Defendants in connection with the same issue is currently pending in the Court of Chancery, which undoubtedly has jurisdiction over it.[12] *See In re MetLife, Inc. Derivative Litig.*, C.A. No. 2019-0452-SG (Del. Ch.).   Plaintiff Kates is not a party to the Chancery Court action, but the claim there, like Kates' claim here, is derivative, *i.e.*, it is asserted on behalf of MetLife itself.   The interests of judicial economy support declining jurisdiction over the same claim here.

In sum, I find that judicial economy, convenience, and fairness do not provide an affirmative justification to exercise jurisdiction over the state-law claims.   Rather, those considerations support declining jurisdiction.   Accordingly, I recommend that the Court decline jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367(c).[13]

---

[10] At my request, the parties submitted supplemental briefs on the question of whether the Court should exercise jurisdiction over the state-law claims.   (D.I. 52, 53.)

[11] Plaintiff acknowledges that his waste claim (Count IV) rises and falls with his *Caremark* claim (Count III).   (Tr. at 40:18-24.)

[12] The Director Defendants have also moved the Chancery Court to dismiss the *Caremark* claim for failure to make demand and failure to state a claim.   *See Caremark*, 698 A.2d at 967 (stating that director liability based on the duty of oversight is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment").   That motion is pending.

[13] Plaintiff's supplemental letter brief argues that "the Court may retain jurisdiction on an independent ground because there is complete diversity among the parties and the amount in controversy exceeds 75,000.   28 U.S.C.A. § 1332(d)(2)(A)."   (D.I. 52 at 3.)   There are at least four problems with that argument.   First, that basis for jurisdiction is not alleged in the SAC. Second, Plaintiff cited the wrong statute.   Section 1332(d)(2)(A) applies to class actions.   Much of Plaintiff's SAC reads like a securities fraud class action complaint, but it is a derivative action.

## IV.  CONCLUSION

I recommend that the federal securities fraud claims alleged in Counts I and II be dismissed for failure to state a claim.  I recommend that the Court decline to exercise jurisdiction over the state-law claims alleged in Counts III and IV.  Accordingly, I recommend that the Director Defendants' motion to dismiss (D.I. 34) be GRANTED.  I further recommend that Plaintiff be granted leave to amend his complaint within thirty days.[14]

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B),(C), Federal Rule of Civil Procedure 72(b)(1), and District of Delaware Local Rule 72.1.  Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages.  Any response shall be filed within fourteen days thereafter and limited to ten pages.  The failure of a party to object to legal conclusions may result in the loss of the right to *de novo*

---

Third, the record before the Court does not demonstrate complete diversity of citizenship as of the filing date of the complaint.  *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570-71 (2004) (describing the "time-of-filing" rule—that jurisdiction depends upon the state of things at the time of the action brought—as "hornbook law").  Plaintiff submitted with his supplemental briefing a chart indicating the state of residency for himself and the Director Defendants "as of May 20, 2020." (D.I. 52, Ex. C.)  The record is silent as to the residency of the parties when Plaintiff filed suit.

Fourth, Plaintiff's argument fails to take into account MetLife's citizenship.  The facts alleged in the SAC suggest that MetLife might be a citizen of Delaware and New York for purposes of diversity jurisdiction.  *See* 28 U.S.C. § 1332(c).  (SAC ¶¶ 15, 18.)  Plaintiff states that two of the Director Defendants are also citizens of New York. (D.I. 52, Ex. C.)  If MetLife is considered to be the plaintiff in this derivative action, complete diversity would be destroyed.  *Compare Messinger v. United Canso Oil & Gas Ltd.*, 80 F.R.D. 730, 733 (D. Conn. 1978) ("Although the 'beneficiary' corporation is named as a defendant, it is a nominal defendant only, and it is actually the real party in interest on the plaintiff's side."); *with Beck v. Dobrowski*, 559 F.3d 680, 687 (7th Cir. 2009) ("A corporation is controlled by its management, and when the management opposes the derivative suit the corporation is treated as a defendant rather than as a plaintiff for purposes of determining whether there is diversity jurisdiction.") (citations omitted)).

If Plaintiff amends his complaint, he should be prepared to address those issues.

[14] Defendants oppose the opportunity to amend (D.I. 34 (requesting dismissal with prejudice)), but it is not clear from this limited record that amendment would necessarily be futile.  *See Alston v. Parker*, 363 F.3d 229, 235-36 (3d Cir. 2004) (holding that leave to amend should be granted "unless a curative amendment would be inequitable, futile, or untimely").

26

review in the district court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated October 9, 2013, a copy of which can be found on the Court's website.

Dated:   July 27, 2020

_____
Jennifer L. Hall
UNITED STATES MAGISTRATE JUDGE